Jimmy PHILLIPS, American Savings & Loan Association, J. M. Falkner, Banking Commissioner of Texas, et al., Petitioners,

v.

BRAZOSPORT SAVINGS & LOAN ASSOCIATION, Fort Bend Federal Savings & Loan Association, and Gulf Savings & Loan Association, Respondents.

No. A–8874.

Supreme Court of Texas.

March 20, 1963.

Rehearing Denied May 8, 1963.

Will Wilson, Atty. Gen., Bob Shannon, Asst. Atty. Gen., Clark, Thomas, Harris, Denius & Winters, Austin, for petitioners.

R. W. Lindsey, Rosenberg, Peareson, Scherer & Roberts, Richmond, McKay & Avery, Austin, for respondents.

HAMILTON, Justice.

This case involves the validity of an order of the Banking Commissioner granting a charter and certificate of authority to American Savings & Loan Association. Respondents—Brazosport Savings & Loan Association, Fort Bend Federal Savings & Loan Association and Gulf Savings & Loan Association—attacked the order in the district court; that court rendered judgment upholding the order of the Commissioner. The Court of Civil Appeals reversed and rendered judgment canceling the charter and certificate of authority of the American Savings & Loan Association. 353 S.W.2d 78. The officers and directors of American Savings & Loan Association and the Banking Commissioner, J. M. Falkner, are petitioners here.

Respondents contended in the Court of Civil Appeals that the order was invalid on two main grounds: (I) Certain procedural defects rendered the order illegal and (II) the order was not supported by substantial evidence. The Court of Civil Appeals sustained respondents' first contention and held the order illegal, but did not pass on the contention that the order was not supported by substantial evidence. Respondents make both contentions in this court.

## I. *Procedural Matters*

Respondents urge three procedural matters which they say deprive the Commissioner of authority to grant the charter:

(A) one of the associates' taking the acknowledgments of the other associates' signatures on the articles of association, (B) failure of Commissioner to require petitioners to file supporting data with the articles of association as provided by Rule 2.1 of the Rules and Regulations for Building and Loan Associations of the Finance Commission of Texas, and (C) the Commissioner's considering an investigator's report which was not introduced at the administrative hearing.

### (A) *Acknowledgment*

Respondents contend that the Commissioner was without jurisdiction to grant the charter because the application and articles of association were not properly acknowledged as required by Vernon's Ann.Civ.St. Article 881a–29 [1] in that one of the members of the Association took the acknowledgment of the 51 other members who signed the articles. The articles of association filed with the Banking Commissioner by the petitioners were signed by 52 persons. One of those signing the articles, Elizabeth B. Bice, a notary public, took the acknowledgments of the 51 others signing the articles. Her own acknowledgment was taken by another notary not a member.

While this court has not passed on the question, it appears from other jurisdictions that when the statute requires that articles of incorporation be acknowledged, then a *valid* acknowledgment is a prerequisite to a statutory right to the granting of the charter. People v. Montecito Water Co., 97 Cal. 276, 32 P. 236, (California S.Ct.); People ex rel. Erie R. Co. v. Board of Railroad Commissioners et al., 105 App.Div. 273, 93 N.Y.S. 584.

█ The general rule in this state and other jurisdictions is that one who is finan-

1. "Any number of persons, not less than five (5), who are citizens of this state, desiring to incorporate a building and loan association may, by complying with the provisions of this Act and entering into articles of association, become a corporate body. Such articles of asso- ciation shall be signed by the persons associating and acknowledged before some person authorized by the laws of this state to take acknowledgments to deeds, and shall set forth: * * * [lists information which articles must contain]."

cially and beneficially interested in a transaction is disqualified to take an acknowledgment concerning the transaction. Brown v. Moore, 38 Tex. 646; Rothschild v. Dougher, 85 Tex. 332, 20 S.W. 142, 16 L.R.A. 719; Creosoted Wood Block Paving Company v. McKay, Tex.Civ.App., 211 S.W. 822; Gulf Production Company v. Continental Oil Company, 139 Tex. 183, 132 S.W.2d 553, 164 S.W.2d 488; 1 Tex.Jur. 2d, pp. 389–390, § 38; see Comment, 14 B.L.Rev. 299 (1962).

■■ However, we think that it was the purpose and intent of the Legislature in requiring that "[s]uch articles of association shall be signed by the persons associating and acknowledged before some person authorized by the laws of this state to take acknowledgments to deeds * * *" to assure the Commissioner that the signatures of the incorporators were genuine and to prevent fraud or undue influence. Respondents do not so much as suggest that the signatures were not genuine, or that there was bad faith, or fraud, or undue influence. We hold that the fact that one of the associates happened to be the notary who took the acknowledgments of the other 51 associates does not render invalid the charter granted pursuant thereto.

(B) *Failure to File Supporting Data*

Rule 2.1 provides as follows:

"When articles of incorporation of a new association are presented to the Banking Commissioner for his approval, such articles shall be accompanied by the proposed By-Laws of the association and statements, exhibits, maps and other data properly verified, which shall be sufficiently detailed and comprehensive to enable the Commissioner to pass upon the proposed charter as to (1) the character, responsibility and general fitness of the persons named in the articles; (2) whether the public convenience and advantage will be promoted by allowing such proposed association to be incorporated and engage in business, taking into consideration (a) that insurance of the accounts of the proposed association has been applied for and that such insurance will probably not be refused by the Federal Savings and Loan Insurance Corporation, (b) that such proposed association will have and maintain independent quarters with a ground-floor location or its equivalent, (c) that such proposed association will have qualified, full-time management, and (d) the adequacy of the initial capital and surplus of the proposed association; and (3) whether the population of the neighborhood of such place and in the surrounding country affords a reasonable promise of adequate support for the proposed association."

■ The Commissioner testified at the trial that it has been his custom not to require the filing of this data if there was to be a hearing. Whether there was to be a hearing depended upon whether or not there were protestants who wished to challenge the granting of the charter. (Rule 2.3 of the Rules and Regulations) Since there was to be a hearing petitioners did not file accompanying data.

Respondents contend that Rule 2.1 requiring the filing of this data is mandatory and jurisdictional and that an order granting a charter when no data has been filed is void.

We overrule this contention. The requirements of this rule are not jurisdictional.

Article 881a–2, from which the Commissioner gets his authority to grant charters, provides as follows:

"When any persons shall file a proposed charter or articles of agreement as is elsewhere herein provided, if it appears to the satisfaction of the Banking Commissioner of Texas that the minimum capital required has been paid in cash into the treasury of the association upon subscriptions for shares, the

Banking Commissioner of Texas shall ascertain from the best sources at his command, and by such investigation as he may deem necessary, the expense of such investigation to be paid by the incorporators, whether the character, responsibility and general fitness of the persons named in the articles of incorporation are such as to command confidence and warrant belief that the business of the proposed building and loan association will be honestly and efficiently conducted in accordance with the intent and purpose of this Act, and whether the public convenience and advantage will be promoted by allowing such proposed building and loan association to be incorporated and engaged in business, and whether the population in the neighborhood of such place and in the surrounding country affords a reasonable promise of adequate support for the proposed building and loan association. If it shall be satisfied concerning the several matters specified, the Banking Commissioner of Texas shall issue under his official seal a certificate reciting in substance the filing in its office of the articles of incorporation; that such articles conform to all requirements of the law, and that they have been approved, whereupon the persons named in the articles of association, their associates and successors, shall become a corporate body  *  *."

■ The statutory mandate is that the Commissioner must find (1) that the character of the incorporators is satisfactory, (2) that the public convenience and advantage will be served by the granting of the charter and (3) that the population will support a building and loan association. The statute gives the Commissioner the power to "ascertain [these facts] from the best sources at his command, and by such investigation as he may deem necessary." The statute nowhere requires that the Commissioner require the filing of this supporting data at the time of filing the articles of association. This rule is one which the

Finance Commission has enacted for the convenience of the Banking Commissioner. The filing of this data merely provides the Banking Commissioner with another source of information. Nothing in the rule imports that its purpose is to acquaint a protestant with the evidence which an applicant is relying on. The Commissioner testified at the trial that his practice has been not to require the filing of the data when there is to be a hearing. He relies on the hearing and other sources of data necessary to a determination as to population, character, and public convenience and advantage. This interpretation of the rule is in harmony with the statute, since the statute gives him discretion to gather data from the best sources at his command.

■ Respondents contend that they have been deprived of their constitutional rights by the failure of petitioners to file the data, in that they were not able to properly prepare for the hearing, not knowing what evidence was to be offered by the applicants. This is untenable. In the first place, the rule does not provide that the data be filed before the hearing, but upon presentation to the Commissioner for approval. This could well mean *at the hearing*. In the second place, we can find no unfairness in the Commissioner's not requiring the filing of such data before the hearing was held because the respondents knew exactly who the incorporators were, they knew the town in which the association was to be located, and what the factual issues would be, since they are set out by the statute.

Respondents had ample opportunity after notice to prepare for the hearing. They knew that in order for the Commissioner to grant the charter he would have to be satisfied as to the character of the incorporators, as to the public advantage and convenience for granting the charter, and that the population showed promise of sufficient support for the association. If one or more of the conditions could not be met, respondents had every opportunity of showing the necessary facts to the Commissioner

Under the circumstances we find no constitutional rights of respondents to be violated by the failure of the Commissioner to require petitioners to file supporting data before the hearing.

The rule is manifestly for the purpose of aiding the Commissioner in performing his duty and not for the purpose of apprising a protestant of evidence to be introduced at a hearing. He may disregard it without infringing upon the rights of the respondents. 42 Am.Jur. 448, Public Administrative Law, § 115.

### (C) *Evidence not Presented at the Hearing*

As their third ground of illegality respondents contend that the Commissioner's relying on certain evidence not introduced at the administrative hearing deprives them of due process of law.

At the hearing J. F. Crews—one of the organizers of American Savings & Loan Association of Lake Jackson, Texas—appeared and testified. Protestants also appeared and gave evidence.

Before the hearing the Commissioner had sent out one Benson, a member of his staff, to investigate conditions in the Lake Jackson area, and Benson filed his report. It is this report which was never introduced at the hearing that respondents complain of most.

Early in the administrative hearing the Commissioner proposed that there be another hearing at a later date, and the parties agreed, but after all parties were heard, he said that he did not see any need for another hearing; thereupon, the hearing came to a close.

In the first Brazosport case we held that respondents have a vested property right in their franchises and that due process of law entitled them to challenge the granting of a new charter and to get judicial review under the substantial evidence rule. Brazosport Savings & Loan Association v. American Savings & Loan Association, 161 Tex. 543, 342 S.W.2d 747 (1961).

Respondents contend that the Commissioner's relying on evidence not introduced at the hearing deprives them of due process of law and that judicial review under the substantial evidence rule does not cure that want of due process.

In support of their contention that the 14th Amendment due process clause guarantees them the right to have all the evidence relied on by the Commissioner brought out at the administrative hearing, respondents cite Interstate Commerce Commission v. Louisville & Nashville Ry., 227 U.S. 88, 33 S.Ct. 185, 57 L.Ed. 431; United States v. Baltimore & Ohio Southwestern Ry. Co., 226 U.S. 14, 33 S.Ct. 5, 57 L.Ed. 104; Southern Stevedoring Co. v. Voris, 190 F.2d 275 (5th Cir., 1951); Trustees of Village of Saratoga Springs v. Saratoga Gas, Electric Light & Power Co., 191 N.Y. 123, 83 N.E. 693, 18 L.R.A.,N.S., 713; Wichita R. & Light Co. v. Court of Industrial Relations, 113 Kan. 217, 214 P. 797; American Employers' Insurance Co. v. Commissioner of Insurance, 298 Mass. 161, 10 N.E.2d 76; Pennsylvania R. Co. v. New Jersey State Aviation Commission, 2 N.J. 64, 65 A.2d 61; Dembeck v. Bethlehem Shipbuilding Corp., 166 Md. 21, 170. A. 158; and Coleman v. Watts, 81 So.2d 650 (Fla.).

We have examined these cases and have concluded that except for Coleman v. Watts, supra, they fall into two categories: (1) cases which state the proposition favorable to respondents by way of dictum; the two United States Supreme Court cases represent this category; and (2) cases which are distinguishable from the case at bar because the applicable state or federal statute either expressly or by implication required a full hearing with all the evidence considered by the administrative official "spread on the record" of the administrative hearing. In some of these cases the statute expressly required a full judicial type hearing which by definition includes the right to have all evidence relied on introduced at that hearing. In other cases in the second category, the statute expressly

limited judicial review to the record made at the hearing.

As we have pointed out, Article 881a does not require a hearing of any kind. The rules, however, provide for a hearing in certain instances, but do not provide any procedure. This brings us to a consideration of Coleman v. Watts, supra, which involved a Florida statute somewhat similar to Article 881a in that there were no procedural requirements prescribed by the Legislature. In that case the State Board of Bar Examiners operating under statutory authority denied an applicant a license on the ground of moral unfitness without disclosing at a hearing the specific charges against him or the evidence of his unfitness relied on by the examiners. The Supreme Court of Florida held this to be a violation of procedural due process and reversed the Board order denying the license.

We think the fact that the applicant in that case was accused of moral unfitness sufficiently distinguishes that case from the case at bar.

Aside from the constitutional requirements, respondents also cite Service v. Dulles, 354 U.S. 363, 77 S.Ct. 1152, 1 L.Ed.2d 1403. This was a case in which the Secretary of State discharged a foreign service officer on the recommendation of the Loyalty Review Board without himself reading the evidence and without making an independent determination. The Secretary of State discharged this officer under the authority of the "McCarran Rider" to the Appropriations Act for 1947. 65 Stat. 581. The "McCarran Rider" gives the Secretary of State authority to discharge employees "in his absolute discretion * * * whenever he shall deem such termination necessary or advisable in the interests of the United States." The McCarran Rider gave the Secretary additional authority to discharge free of the procedural regulations imposed on him under the Loyalty Security Program. But the Supreme Court held that, while he need not have done so, the Secretary of State had limited his own authority by those rules and regulations and that he must abide by them. The rules required him to examine the evidence of the employees' disloyalty and to make an independent determination. Failure to do this rendered the discharge void.

Respondents seek to invoke this principle in the instant case, but they do not direct us to any evidence in the record tending to show that the Commissioner had so construed his authority to grant charters as being limited by a procedural rule requiring that all evidence be introduced at the administrative hearing.

■ In any event, we think that respondents have not been deprived of their procedural rights in this case. It has repeatedly been held by the Texas decisions that the Commissioner is not confined to the evidence actually brought out at the hearing, but may rely upon information disclosed by the office records. Alamo Express, Inc. v. Union City Transfer, 158 Tex. 234, 309 S.W.2d 815 (1958); Railroad Commission v. McDonald, 90 S.W.2d 581 (Tex. Civ.App.1936), no writ history; North East Texas Motor Lines, Inc. v. Texas & Pacific Motor Transport Co., 159 S.W.2d 926 (Tex.Civ.App.1941) no writ history; Texas Industrial Traffic League v. Railroad Commission of Texas, 255 S.W.2d 903 (Tex. Civ.App.1953), ref'd n. r. e.

■ Since the statute expressly authorizes the Commissioner to make an independent investigation and to rely on the results thereof in making his determination, respondents are charged with notice of the likelihood of such an investigation and report. Moreover, before the hearing, investigator Benson interviewed officers of two of the protesting building and loan associations, thus putting them on actual notice that the Commissioner was exercising his authority to make an independent investigation. Yet the respondents participated in the administrative hearing before the Commissioner without once demanding to see the data collected by the investiga-

tor. Toward the end of the hearing the Commissioner stated that he did not see any need for another hearing. In reply to this respondents' attorney said, "* * * As I understand it, if the applicant is going to offer anything further, it will be by public hearing." And the Commissioner answered, "Sure, if they have anything else to offer, we will get to it."

Thus respondents demanded that the Commissioner continue the hearings in the event that petitioners offered more evidence, but they never asked to have the investigator's report brought out at a public hearing. The Commissioner has never refused to produce the report at a public hearing.

■ There is no showing that there was anything secret about this report or that it was not available to the parties at all times for the mere asking. Under these circumstances we find that no due process was denied respondents by the failure of the Commissioner to introduce the investigator's report at the hearing.

## II. *Was there Substantial Evidence?*

While respondents mainly rely on the argument that the Commissioner had no right to rely on incompetent evidence (evidence not presented at the administrative hearing), they do have counter points of error by means of which they argue that the holding of the Court of Civil Appeals is correct because there was not substantial evidence on which the Commissioner could base his decision; thus, it becomes our duty to review the evidence available to the Commissioner at the time he granted the order to determine whether or not that order may stand.

■ Review under the substantial evidence rule entails the following principles: The order of the Commissioner is presumed to be valid. The courts may not substitute their discretion for that delegated to the Commissioner by the Legislature; thus, the only question before the trial court is whether the Commissioner's decision was arbitrary and made without regard to facts. Railroad Commission v. Shell Oil Co., 139 Tex. 66, 161 S.W.2d 1022 (1942); Alamo Express, Inc. v. Union City Transfer, 158 Tex. 234, 309 S.W.2d 815 (1958); Thomas v. Stanolind Oil & Gas Co., 145 Tex. 270, 198 S.W.2d 420 (1946). The test of whether an order is supported by substantial evidence is stated in Railroad Commission v. Shell Oil Co., supra, at 1029 of 161 S.W.2d:

"* * * where the order of the agency under attack involves the exercise of the sound judgment and discretion of the agency in a matter committed to it by the Legislature, the court will sustain the order if the action of the agency in reaching such conclusion is reasonably supported by substantial evidence. This does not mean that a mere scintilla of evidence will suffice, nor does it mean that the court is bound to select the testimony of one side, with absolute blindness to that introduced by the other. After all, the court is to render justice in the case. The record is to be considered as a whole, and it is for the court to determine what constitutes substantial evidence. The court is not to substitute its discretion for that committed to the agency by the Legislature, but is to sustain the agency if it is reasonably supported by substantial evidence before the court. If the evidence as a whole is such that reasonable minds could not have reached the conclusion that the agency must have reached in order to justify its action, then the order must be set aside." [2]

Under the presumption of validity, the evidence which the court may consider in-

---

2. This statement is quoted in Trapp v. Shell Oil Co., 145 Tex. 323, 198 S.W. 2d 424, and in Alamo Express, Inc. v. Union City Transfer, supra. For another statement of the rule see Shupee v. Railroad Commission, 123 Tex. 521, 73 S.W.2d 505.

cludes proof made at the trial of facts in existence at the time the Commissioner entered his order, whether the Commissioner is shown to have been aware of those facts or not. Cook Drilling Co. v. Gulf Oil Corporation, 139 Tex. 80, 161 S.W.2d 1035 (1942); Railroad Commission v. Shell Oil Co., supra; Alamo Express, Inc. v. Union City Transfer, supra.

### Summary of the Evidence

The character, responsibility and general fitness of persons named in the articles of association have not been questioned.

As to public convenience and advantage, the Finance Commission has in Rule 2.1 announced four criteria: (a) Insurance of accounts—The record includes a copy of a letter from Federal Home Loan Bank of Little Rock acknowledging receipt by it of an application for insurance prior to the granting of the charter. This letter refers to accompanying forms for application of insurance to be returned after the charter is granted. Respondents do not show us anything in the record tending to rebut the application for insurance or tending to show that it will not be granted; thus, they have not met the burden of proving that there was no substantial evidence to support that finding.

(b) Independent ground floor quarters— Crews testified at the trial that the association had leased 900 square feet of independent ground floor office space in downtown Lake Jackson and had done so before the Commissioner granted the charter. This information was available to the Commissioner at the time he granted the charter. Again, respondents fail to direct us to evidence in the statement of facts tending to refute that this was a fact at the time the Commissioner entered his order. They have failed to meet their burden of proof in this respect.

(c) Full-time management—Crews testified at the trial that B. J. Roberts had been selected to be manager and that the Commissioner had been so informed before he granted the charter. Crews also testified as to Roberts' business background and qualifications. Respondents do not rebut this testimony; they merely point to the Commissioner's statement that while he regarded qualified management as the most important single factor, he did not investigate Roberts personally, leaving that to his investigator Benson.

(d) Adequacy of initial capital—Crews testified that paid in capital was $140,000. This data was made available to the Commissioner as early as the date of the hearing. Respondents do not have evidence in the record rebutting this.

On the question of whether or not the population of the area to be served by the proposed building and loan association promised adequate support, Crews testified from a report prepared by the association; this report gives a rather impressive mass of data concerning economic conditions in and around Lake Jackson. Crews testified at the trial that the report contained facts which were in existence at the time the Commissioner granted the charter. Some examples of that data will be sufficient for our purposes:

Brazoria County was growing faster than neighboring counties due to increased industrial activity. Lake Jackson's population grew from almost 3,000 in 1950 to 10,000 in 1957. Residential building permits were increasing rapidly. Dow Chemical, one of the two main industries in the area, employed most of Lake Jackson residents. Property valuations in Lake Jackson increased 12 times during the period 1944–1958. Savings during the period 1954–1958 increased some sixfold.

Benson's field report, made for the Commissioner, was introduced at the trial and includes the following data: Estimated population of the area to be served by the proposed building and loan association was 32,000. Lake Jackson is a "[m]odern city, built and incorporated in recent years. Ninety per cent of [its] inhabitants [are] employed by Dow Chemical, Freeport, nine

**938**

miles distant." The population trend is "upward". Ninety-eight per cent of the homes are occupied by owners. Ninety-eight per cent of the dwellings were single family. The average selling price for single family dwellings was $15,000. Forty per cent of the residentially zoned property was undeveloped or vacant. Dow Chemical Company was continually expanding. Freeport harbor was being expanded. Two industries employ 5,000 workers and their payrolls are $28,000,000. Proposed industrial expansion of the area is likely to cause rapid population increase in the area. There are four competing building and loan associations in the area, none in Lake Jackson itself.

Benson's report concluded with a statement that he believed that the character, responsibility, and general fitness of the persons named in the articles of association would "command confidence and warrant a belief that the building and loan association would be honestly and efficiently operated."

Respondents do not seriously attempt to rebut this data; their argument has consistently been that there were already enough building and loan associations in the area and that to charter one more would spread the business too thin, cause those building and loan associations in existence to operate at a loss and thereby detract from the public convenience and advantage.

For example, they testify that Brazosport Savings & Loan Association is located in Freeport, just eight miles from Lake Jackson, and that there are good, well travelled roads connecting these cities. There is similar testimony as to a number of other building and loan associations in the area. They also testified that there was active competition for the Lake Jackson business.

Respondents rely heavily on testimony of officers from other building and loan associations tending to show that business generally has been slow and that applications for loans have likewise been off. Re-

spondents have testimony that two newly formed building and loan associations are operating at a loss. The Commissioner testified that new associations were not expected to make money in the early years of their existence.

 The decision as to the advisability of permitting another building and loan association to operate in the area calls for the exercise of discretion on the part of the Commissioner. The mere fact that there are a number of associations serving Lake Jackson does not preclude the Commissioner from finding that the public convenience and advantage would be served by having a building and loan association located in the town of Lake Jackson.

We hold that the Commissioner's order granting the charter is reasonably supported by substantial evidence; therefore, it is not arbitrary.

The judgment of the Court of Civil Appeals is accordingly reversed and the judgment of the trial court affirmed.