James O. GERST, Savings and Loan Commissioner of Texas et al., Appellants,

v.

GIBRALTAR SAVINGS ASSOCIATION, Appellee.

No. 11477.

Court of Civil Appeals of Texas.

Austin.

Feb. 8, 1967.

Rehearing Denied March 1, 1967.

Second Motion Denied March 22, 1967.

Waggoner Carr, Atty. Gen., Hawthorne Phillips, First Asst. Atty. Gen., T. B. Wright, Executive Asst. Atty. Gen., Paul W. Phy, John W. Fainter, Jr., Asst. Attys. Gen., John W. Stayton, Austin, Hutcheson, Taliaferro & Hutcheson, Thad T. Hutcheson, Houston, Sneed & Vine, Houghton Brownlee, Jr., Austin, DeLange, Hudspeth, Pitman & Katz, C. M. Hudspeth, Houston, for appellants.

Joe R. Long, Brown, Sparks, Erwin, Maroney & Barber, Frank C. Erwin, Jr., Austin, for appellee.

HUGHES, Justice.

This suit was filed by Gilbraltar Savings Association, appellee, against James O. Gerst, Savings and Loan Commissioner of Texas, to set aside an order made by him denying the application of appellee to open a savings and loan branch office at 1105–1107 Main Street in Houston, Harris County, Texas. This order was entered following notice to all interested parties and a public hearing before the Commissioner.

The Commissioner made the findings required by Art. 852a, Vernon's Ann.Tex.Civ. St. (Texas Savings and Loan Act)' and all were favorable to appellee except the Commissioner found that there was no public need for the proposed branch office, that the volume of business in the community in which the proposed branch office would conduct its business was not such as to indicate a profitable operation, and that the establishment of such office would cause excessive competition and result in undue harm to other existing associations.

In the trial court, interventions were filed by Houston First Savings Association, Benjamin Franklin Savings Association, Guaranty Federal Savings and Loan Association, and Metropolitan Savings Association. They aligned themselves with the Commissioner, and are appellants.

Trial to the court resulted in a judgment setting aside the order of the Commissioner above described, holding it null, void and

of no force and effect, and remanding it to the Commissioner for further proceedings not inconsistent with the judgment. The basis of the court's judgment was that the order of the Commissioner was not reasonably supported by substantial evidence. The trial court also held the order of the Commissioner was not supported by a preponderance of the evidence.

Four separate briefs have been filed by appellants. The points of error are not identical in all briefs. The principal appellant is the Commissioner. We will dispose of such points as he presents which are essential to our disposition of this case and then turn our attention to additional points made by the other appellants.

█ The first five points made by the Commissioner are jointly briefed. They are, in substance, that the trial court erred in not sustaining the motion in limine filed by the Commissioner in which he sought an order instructing all parties not to introduce or attempt to introduce any evidence which was not competent evidence introduced at the hearing before the Commissioner on the application of Gibraltar, and the error of the trial court in admitting on the trial testimony and evidence which had not been heard or admitted or noticed at such hearing.

We sustain these points.

Sec. 11.12(5) (b) of Art. 852a provides, in part, that upon judicial review of any act, order, ruling or decision of the Commissioner, except an order made under Sec. 8.14 of the Act which is not applicable here, "no evidence shall be admissible which was not adduced at the hearing on the matter before the Commissioner or officially noticed in the record of such hearing."

The Supreme Court has held the Commissioner's order is to "stand or fall upon the evidence adduced and matters noticed at the Commissioner's hearing," and that, "It is from this record that the District Judge is

to determine whether or not the Commissioner's order is arbitrary, i. e., whether it is reasonably supported by substantial evidence." Gerst v. Nixon, Tex.Sup., 411 S.W.2d 350, November 30, 1966, affirming this Court in Tex.Civ.App., 399 S.W.2d 845.

By counterpoint, appellee contends that if the court erred in overruling the Commissioner's Motion in limine, discussed above, such error was harmless under Rule 434, Texas Rules of Civil Procedure.

█ We agree that, per se, the error is harmless. However, if the evidence erroneously admitted is essential to support the judgment of the trial court, then the judgment must be reversed, not because of the improper admission of such evidence, but because, as a matter of law, the judgment is erroneous. Neither the trial court nor this Court has any discretion in determining whether appellee is to have the branch office it seeks. This discretion is vested exclusively in the Commissioner. The review by the courts is restricted to the legal question of whether the order of the Commissioner is reasonably supported by substantial evidence.

Appellee also has a counterpoint to one of the points under discussion to the effect that the trial court correctly admitted in evidence the testimony of Dr. Francis Yeager as such evidence was part of the record of the proceedings at the hearing before the Commissioner and properly certified by him to the court below.

█ We will not dwell upon this point because the record made before the Commissioner is before us and it, and it alone, is entitled to consideration by us in determining the legal validity of the order of the Commissioner.

The Commissioner's last point is that the order in litigation was reasonably supported by substantial evidence.

Under this point the Commissioner argues only the requirement of the statute [1]

1. Art. 852a Sec. 2.08(3).

that a "public need for the proposed branch office be shown." [2]

At the hearing before the Commissioner, Gibraltar presented only two witnesses. Their testimony appears in Plaintiff's Exhibit 3 which is the transcript of the proceedings before the Commissioner and, as stated above, is the only evidence properly before this Court. Witness Monteith testified only briefly and primarily identified one exhibit which was prepared under Mr. Monteith's supervision. It must be noted, however, that Mr. Monteith did not furnish the data for the preparation of the exhibit, but merely prepared the exhibit from information furnished by Dr. Francis Yeager who was not present at the hearing before the Commissioner.

Mr. Michael Lallinger was the other witness who testified before the Commissioner. Mr. Lallinger is the president and chief executive officer of Gibraltar and has been employed by Gibraltar since 1956. Much of Mr. Lallinger's testimony involved matters which are not in dispute and accordingly will not be discussed herein.

Mr. Lallinger testified:

"A It is such a long question, I think my answer may go in—If my answer doesn't suffice, why, if you will give me that question again. My answer, sir, is this: I think there are enough associations in the downtown area to go and adequately serve that area. I do not think that there are enough branch offices of existing associations in the downtown area adequately to serve the area and take care of their customers, and anybody else that may want to transact business with them."

Mr. Lallinger further testified:

" * * * I don't think a Federal and a Metropolitan is needed in the downtown area * * * I still think there is a need for a Gibraltar office if there are ten new charters put down there."

Mr. Lallinger also testified that a number of appellee's customers want a downtown service.

Appellee bases its case against the order of the Commissioner on the requirement of showing a "public need" primarily upon an affidavit of Dr. Francis Yeager which was admitted in evidence by the Commissioner on the hearing before him. The only other testimony before the Commissioner referred to by appellee in support of its attack on the order of the Commissioner is that of Mr. Lallinger wherein he testified that he did not think there were enough branch offices of existing associations in downtown Houston to adequately serve the area. This testimony of Mr. Lallinger has been quoted above.

■ Without consideration of the affidavit of Dr. Yeager, it is our opinion that the order of the Commissioner insofar as it found no public need [3] for the proposed

2. Guaranty Federal has a similar point but it is factually based primarily upon evidence introduced in the trial court which was not in the record made before the Commissioner, which evidence we have held inadmissible. Guaranty Federal has no point to the effect that the trial court should have confined itself to the record made before the Commissioner.

Metropolitan has a similar point and for statement under this point it adopts the statement made by Houston First.

The statement made by Houston First under this point is, in substance, the same as the statement made by the Commissioner. Houston First has points to the effect that the affidavit of Dr. Yeager was inadmissible and that the trial court should have confined itself to the record made before the Commissioner.

3. "We think the words 'public need' as used in Section 2.08(3) have the same meaning as the words 'public necessity' as used in the Texas Banking Code of 1943, l. c. art. 342–305, Vernon's Ann. Tex.Stats., that is, a substantial or obvious community need for the proposed association in the light of attendant circumstances, as distinguished from a mere convenience on the one hand and an absolute or indispensable need on the other." Gerst v. Nixon, Tex.Sup.Ct., 411 S.W.2d 350, Nov. 30, 1966.

branch office is reasonably supported by substantial evidence. Moreover, it is our opinion that the evidence offered by appellee to sustain a finding of public need was insufficient for that purpose under the rule that the finding must be reasonably supported by substantial evidence.

Savings and Loan Associations and their branches are, in their creation, governed by the same basic standards. Southwestern Savings and Loan Association v. Falkner, 160 Tex. 417, 331 S.W.2d 917. They are governed by the same laws and, as far as the public is concerned, perform identical services.

The testimony of Mr. Lallinger that there were enough associations in the downtown area to adequately serve that area is affirmative testimony from appellee's own witness that no public need existed for a branch office in that area.

The Commissioner could not, in our opinion, find reasonable support in the testimony of Mr. Lallinger to sustain a finding contrary to the import of this testimony of Mr. Lallinger.

In addition, there were other witnesses before the Commissioners who testified that there was no public need for the branch office sought by appellee.

The Commissioner takes the position that the affidavit of Dr. Yeager was hearsay evidence. Taking this position, we assume that he did not consider such affidavit in ruling upon the application of appellee. If the Commissioner is wrong about this then this case should be sent back to him for reconsideration.

■ We are of the opinion that the affidavit of Dr. Yeager, being hearsay, was not substantial evidence upon which the Commissioner could base his decision, granting or refusing the application of appellee.

In Gerst v. Nixon, cited herein, the Court stated, "The circumstance that the record of the Commissioner's hearing contains hearsay or other species of evidence deemed unreliable is a matter for the consideration of the trial judge in determining the issue of 'substantial evidence.'"

■ "Hearsay" evidence, not subject to some exception, has no probative force, even though admitted without objection. Henry v. Phillips, 105 Tex. 459, 151 S.W. 533. It is, therefore, "unreliable." [4]

Art. 852a, Sec. 11.12(5) (b) provides, in part, that " * * * all fact issues material to the validity of the Act, order, ruling, decision or rule or regulation complained of shall be redetermined in such trial on the preponderance of the competent evidence * * *."

The Court in Gerst v. Nixon, supra, has held, on Constitutional grounds, that the quoted portion of the statute is invalid. In view of the language of the Court in that opinion which we have previously quoted to the effect that hearsay and other unreliable evidence does not constitute substantial evidence, we cannot give significance to the elimination of the words "competent evidence" from the statute and hold that by the deletion of those words the Court intended to say that incompetent evidence could constitute substantial evidence.

Sec. 2.01 of Art. 852a contains the requirements of an application for a charter for a savings and loan association and calls for filing statements containing certain information and paragraph (4) of such section provides that all statements of fact tendered to the Commissioner in connec-

---

4. In Benson v. San Antonio Savings Association, 374 S.W.2d 423, Tex.Sup.Ct., the Court held:
   "The investigative report, even if admissible in evidence in the trial court by reason of Art. 3731a, § 1, Vernon's Ann. Civ.Stat., is necessarily hearsay and whether favorable or unfavorable to San Antonio Association, could not serve to show that the Commissioner's rejection of the application was not supported by substantial evidence."

tion with such application shall be under oath.

Sec. 2.08 of Art. 852a provides, in part, that the Commissioner shall not approve any charter application unless he shall have affirmatively found from "* * * the data furnished with the application, the evidence adduced at such hearing and his official records, * * *" certain prerequisites.

In Gerst v. Nixon, supra, the Court stated:

"The requirement that the Commissioner file a record of the proceedings had before him with the District Court clearly implies that such record is to be considered by the court. While the last phrase contained in Section 11.12, subsection 5(b), could have been more artfully worded, it seems reasonably clear that when considered in connection with other portions of the Act, the purpose of the words, 'no evidence shall be admissible which was not adduced at the hearing on the matter before the Commissioner or officially noticed in the record of such hearing', was to adopt the rule that the Commissioner's order is to stand or fall upon the evidence adduced and matters noticed at the Commissioner's hearing. It is from this record that the District Judge is to determine whether or not the Commissioner's order is arbitrary, i. e., whether it is reasonably supported by substantial evidence."

Appellee relying upon the record made before the Commissioner and certified to the District Court which contains the affidavit of Dr. Yeager and which does not contain any objection to its filing before the Commissioner contends that such affidavit was "officially noticed" and hence a part of the record to be considered by the trial court on appeal.

In Phillips v. Brazosport Savings and Loan Association, 366 S.W.2d 929, Tex. Sup.Ct., the Court construed Rule 2.1 of the Rules and Regulations for Building and Loan Associations which provided that when articles of incorporation were presented to the Banking Commissioner for approval such articles should be accompanied by statements, exhibits, data etc. properly verified and sufficiently comprehensive to enable the Commissioner to pass upon the proposed charter. The requirements of this rule are very similar to the present requirements of Sec. 2.01(4) Art. 852a. In holding that the absence of such supporting data did not prevent issuance of the charter the Court said.

"The Commissioner testified at the trial that it has been his custom not to require the filing of this data if there was to be a hearing. Whether there was to be a hearing depended upon whether or not there were protestants who wished to challenge the granting of the charter. (Rule 2.3 of the Rules and Regulations) Since there was to be a hearing petitioners did not file accompanying data.

Respondents contend that Rule 2.1 requiring the filing of this data is mandatory and jurisdictional and that an order granting a charter when no data has been filed is void.

We overrule this contention. The requirements of this rule are not jurisdictional.

* * * * * *

This rule is one which the Finance Commission has enacted for the convenience of the Banking Commissioner. The filing of this data merely provides the Banking Commissioner with another source of information.

* * * * * *

The rule is manifestly for the purpose of aiding the Commissioner in performing his duty and not for the purpose of apprising a protestant of evidence to be introduced at a hearing. He may disregard it without infringing upon the rights of the respondents. 42 Am.Jur. 448, Public Administrative Law, § 115."

We believe that the affidavits and data filed under the present statute should be considered in the same light and for the same purpose as the affidavits and data were considered and treated in Phillips v. Brazosport, supra. This holding will obviate serious constitutional questions which otherwise might be presented.[5]

Appellee does not deny that the affidavit of Dr. Yeager was hearsay because of his nonappearance before the Commissioner and a lack of opportunity to cross-examine him. It says, however, that since cross-examination of Dr. Yeager was conducted in the trial court, that this suffices. We cannot agree. It was the cross-examination by or before the Commissioner which was important. Only the Commissioner has a discretion in this matter which might be affected by such cross-examination.

It is obvious from the brief filed by the Commissioner that he did not consider the affidavit of Dr. Yeager. If it was entitled to consideration, then our duty would be to reverse this cause to the Commissioner[6] in order that he discharge his duty, provided, of course, that the affidavit of Dr. Yeager contains facts from which the Commissioner could have made findings favorable to appellee on the issues in question.

■ We are of the opinion that, conceding the relevancy of the matters discussed in the Yeager affidavit, this case should be reversed to the Commissioner even though he properly gave no weight to the affidavit of Dr. Yeager, this under Rules 434, 505, T.R.C.P. and the opinion in Benoit v. Wilson, 150 Tex. 273, 239 S.W.2d 792, which authorize us to remand rather than render judgment where by so doing the ends of justice will be subserved.

Our opinion is that the affidavit of Dr. Yeager recites facts which if lawfully presented would constitute substantial evidence

sustaining a finding by the Commissioner favorable to appellee on the issue of public need.

Dr. Yeager is an independent economic expert and appears to have high qualifications in his field. We quote the following from appellee's summary of Dr. Yeager's affidavit:

"The proposed location for this branch office at 1105 Main Street is in the heart of Houston's retail district. Nearby are principal retail stores such as Foleys, Sweeneys, Tiffany's, Corrigan's, Woolworth's, Nieman-Marcus, Oshman's, Battlestein's, Krup & Tuffley.

The present population of metropolitan Houston is approximately 1,400,000 people who are members of approximately 375,000 families or households. Many of these households depend upon one or several members who work in downtown Houston in office buildings, stores and banks. Yeager shows downtown Houston in an aerial photograph on Ex. 1, p. 3 of his report. The downtown area is shown on a street map as Exhibit 2 at page 4. It includes the area west of Crawford Street, east of the highway loop interchange, south of Buffalo Bayou and north of Gray Street. This is a 225-block area which comprises the central core of the city. The population of Houston and the downtown area is served by seven savings and loan offices including five principal offices and two branch offices. Gibraltar Savings Association does not have an office located within the area described on exhibits 1 and 2 of the report.

Construction of new office buildings in downtown Houston has tended to reflect general business conditions. From 1910 to 1919 total downtown additions to major structures was 15 buildings containing 1,550,000 square feet. From 1920 to 1929,

5. See Brazosport Savings and Loan Association v. American Savings and Loan Association, 161 Tex. 543, 342 S.W.2d 747, 2 Am.Jur.2d p. 595, 16A C.J.S. Constitutional Law §§ 622, 624, pp. 824 and 834.

6. Sec. 11.12(6), Art. 852a, authorizes this procedure.

26 buildings were constructed containing 3,600,000 square feet. During the depression construction in downtown Houston slowed to 980,000 square feet from 1930 to 1939. From 1940 to 1949 five buildings were added containing 1,515,000 square feet, and from 1950 to 1959 seventeen major structures were built containing 3,525,000 square feet. From 1960 to the end of 1963, thirteen buildings were added containing 6,550,000 square feet. Thus, in four years, from 1960 through 1963, more office space was added to downtown Houston than was added in the 30 years prior, 1930 to 1959. Gibraltar's proposed location is within the area of the most recent growth in new construction. Yeager states that most of the people working in these buildings are salaried people who get paid once or twice each month. Yeager concludes at page 9 of Proponent's Exhibit 1A,

'* * * It is reasonable to expect that many of them already are customers of Gibraltar since Gibraltar has some 60,000 savers who deposit at its main office on Fannin Street at an inconvenient distance from the downtown office buildings. The proposed Gibraltar branch on Main Street in the heart of downtown Houston, would serve Houston's greatly enlarged workday population as described above.'

Yeager made a study of a 49-block area with the proposed site of Gibraltar approximately in the middle of the area. His study showed that within that area there were 33,309 parking spaces. He estimated that Houston's downtown area can accommodate the parking of 75,000 to 125,000 automobiles during a work day, exclusive of street parking. At page 11 of Proponent's Exhibit IA he states,

'Similarly, this suggests the great magnitude of the downtown market to be served by Houston savings and loan associations.'

Plaintiff's Exhibits 23 and 24 show that in 1958 there were eight savings and loan offices serving the downtown area and that as of the date of this order there were only seven such offices serving that area. In 1958, Yeager states there were approximately 432,000 passenger cars in Houston and that as of the date of his report there were approximately 580,000. Yeager stated that in 1960 the daily number of trips made by all types of vehicles in Houston was about 1,800,000. Of these trips approximately twelve per cent or 215,000 began or ended in the central business district. Yeager concluded that the automobile was an important means of transportation in Houston and that the developing system of freeways in Houston served to link the outlying areas with downtown Houston. He stated that contrary to the pattern in many American cities Houston was increasing its workday population in the downtown core area.

In looking at the savings and loan market in Houston, Yeager found total financial savings in Houston of $4 billion $200 thousand; he found that forty per cent of Houston families have income after taxes in excess of $7,000 a year. This compared very favorably with the nation as a whole where only thirty-five per cent of the families have such income and with Texas where the number is twenty-eight per cent. In addition, he found that new savings were being added to the existing stock of savings in Houston at the rate of $150 to $200 million per year. Yeager noted that in December of 1962, such deposits (savings) totaled $402 million. In July of 1964, only 18 months later, total savings deposits in Harris County associations had grown to $626 million.

* * * * * *

Yeager reported that Gibraltar had conducted a survey to discover the degree to which its present customers might use the proposed downtown branch. The survey was conducted on a random sample basis. Fifty-two per cent of those who replied stated that at least one of the family was employed or officing in down-

town Houston. Sixty-three per cent of those replying stated that they would use a branch office of Gibraltar if it were located in the heart of downtown Houston. Yeager concluded from this survey that a significant portion of Gibraltar's customers at the main office on Fannin Street would be better served by a downtown location in the heart of Houston's retail district.

\* \* \* \* \* \*

In addition to the present customers of Gibraltar who would be served by the new branch, Yeager concluded that the facility would attract many new savers who prefer easy access to their holdings and who therefore look for a convenient location. He noted that as of the date of his report only one savings and loan office was located on Main Street in downtown Houston whereas four commercial banks were located on Main Street within two blocks of the proposed savings and loan facility site. In his opinion the seven existing downtown savings associations are not adequate to serve the population growth which has occurred since 1958 and the anticipated growth in the next five to ten years. He stated that the proposed branch was necessary in the interest of the public to be served as measured by past and projected population growth as well as measured by the response of Gibraltar's customers to the survey.

Yeager drew a comparison between Texas, Minnesota and California with regard to growth, population, number of savings offices and total savings. California showed a 45% growth from 1950 to 1960; Minnesota a 17% growth; and Texas a 20% growth. In California the population per savings and loan office is 28,500 with savings per office of $28.6 million; in Minnesota the population per office is 30,400 with savings per office of $16.5 million; and in Texas the population per office is 39,200 with savings per office of $12.2 million. He concluded that this comparison shows that Texas

is the least developed of the three states in terms of the savings and loan industry."

Only the appellant Guaranty Federal seeks to sustain the finding of the Commissioner that the volume of the business in the community was not such as to indicate that the operation of the proposed branch would not be profitable.

The testimony upon which Guaranty Federal relies to support the finding of the Commissioner in this respect is testimony heard in the court below and which was not presented to the Commissioner. This appellant has no point to the effect that testimony at the trial should be restricted to the record made before the Commissioner.

We will not consider the testimony heard in Court which was not before the Commissioner. Without such testimony, the point of Guaranty Federal is stripped of substance. It is overruled.

With respect to the finding of the Commissioner that undue harm would result in excessive competition and result in undue harm to other existing associations, we are of the opinion that this finding is not reasonably supported by substantial evidence produced before the Commissioner.

The record before the Commissioner shows that appellee in fact operated a branch office in downtown Houston for a period of two years and eight months, from June 1959 to February 1962, and that during such period other existing associations prospered. We quote the following summary made by appellee of Mr. Lallinger's testimony before the Commissioner in this regard:

"Mr. Lallinger, president of Gibraltar, made a study of the performance of the other downtown Houston associations which were in business during the two and one-half year period of time for which figures were available—this includes Benjamin Franklin, Houston First, Home, and San Jacinto savings and loan

associations. The results of this study are shown on Plaintiff's Exhibit 3–L, which was introduced before the Commissioner as Proponent's Exhibit 6. The exhibit and the testimony before the Commissioner show that in July of 1958, Benjamin Franklin had approximately $10,500,000 on deposit, and that in December of 1961, six weeks prior to the closing of the Gibraltar branch office at 1201 Capitol Avenue, Benjamin Franklin had attained deposits of $21,955,097. Home Savings Association, during this period of time, increased from $4,826,000 to $10,503,916. Houston First, which had its office located one block from 1201 Capitol increased in deposits from $44,011,000 to $61,877,434. San Jacinto Savings Association showed an increase in savings deposits during this period of time from $3,980,000 to $10,348,944. The chart does not show the growth of the branch offices of Farm and Home Savings or of Guaranty Federal, both located in downtown Houston, for the reason that figures attributable to those branches are not available."

Appellant Houston offered testimony before the Commissioner that appellee's savings, while it operated a branch office in downtown Houston, increased on a ratio of 2–1 over the savings of appellant Houston, and that after the branch office was closed this ratio dropped to 3–2.

Appellant Houston also showed that appellee was a large institution, having 36% of the savings in Houston and adjoining cities at the end of 1962 and 34% of such savings at the end of 1963.

There was evidence before the Commissioner that Guaranty Federal Savings increased only $398,000 over the years 1958–1964.

In addition, there was opinion evidence that existing associations would be harmed by establishment of the branch office sought by appellee.

In our judgment, the finding of the Commissioner that existing associations would be unduly harmed by granting appellee's application is not reasonably supported by substantial evidence.

Existing associations may not grow as fast and may not prosper as much with the competition which the establishment of a branch office by appellee in downtown Houston would furnish, but with the indicated growth of Houston and the present prosperity of existing associations we find no substantial evidence that they would be *unduly* harmed by such competition.

All appellants except the Commissioner have points to the effect that the opinion of this Court in Falkner v. Gibraltar Savings Association, 348 S.W.2d 472, writ ref., n. r. e. is res adjudicata as to this proceeding, and appellant Metropolitan has a point to the effect that Gibraltar is estopped to prosecute its application for a branch office by reason of the position taken by it in Gerst v. Cain, 388 S.W.2d 168, Tex. Sup.Ct.

In April of 1963, Metropolitan Savings Association filed an application for a downtown Houston charter with an office to be located at 1010 Louisiana Street, approximately four blocks from the proposed Gibraltar branch office. At the hearing before the Commissioner in June of 1963, Metropolitan was opposed by Gibraltar and an order was entered by the Commissioner on July 18, 1963, denying the Metropolitan charter application. Subsequently Metropolitan brought suit in the District Court of Travis County, Texas, seeking to obtain the charter, whereupon Gibraltar and certain other associations intervened in opposition to Metropolitan. Thereafter the District Court in December of 1963, the Austin Court of Civil Appeals in May of 1964, and the Texas Supreme Court in February of 1965, ruled favorably to Metropolitan and ordered that its charter be granted. In each of these courts, Gibraltar actively opposed Metropolitan, claiming in substance that the savings and loan facilities then op-

erating in downtown Houston were adequate and that the granting of an additional facility would cause undue harm to other existing associations.

█ There is no basis for judicial estoppel under facts presented. The "position" taken by appellee in Cain was not under oath. Neither was appellee successful in that case. It gained nothing from the position it took. Lacking in these two essentials, judicial estoppel is not shown. Long v. Knox, 155 Tex. 581, 291 S.W.2d 292, Jones v. Jones, 301 S.W.2d 310, Tex.Civ. App., Texarkana, writ ref., n. r. e., Lobit v. Crouch, 323 S.W.2d 618, Tex.Civ.App., Austin, writ ref., n. r. e., 28 Am.Jur.2d, Estoppel and Waiver, Sec. 70.

█ Assuming, but without deciding, that the doctrine of res adjudicata is applicable to the proceedings in Falkner v. Gibraltar, supra, and here, we are of the opinion that in the interval between June 12, 1958, the date of the hearing in first Gibraltar and January 29, 1965, the date of the hearing held by the Commissioner in this case, there has been a material change in the facts as to preclude the application of the rule of res adjudicata. 73 C.J.S. Public Administrative Bodies and Procedure, § 147, p. 480, 34 Tex.Jur.2d 506, Judgments, Sec. 460.

The facts hereinabove stated reflect the validity of this conclusion.

We also note that changes in the law since first Gibraltar prevent the legal issues in the two cases from being identical.

Art. 881a–2, V.T.C.S., considered in first Gibraltar, since repealed, provided that the Commissioner should ascertain that the "public convenience and advantage" would be promoted by the new institution and whether "the population in the neighborhood" affords a "reasonable promise of adequate support" for it. Under the present law, Art. 852a, the Commissioner must find that "there is a public need for the proposed association and the volume of

business in the community in which the proposed association will conduct its business is such as to indicate profitable operation".

It is not our purpose to elucidate upon the precise differences between the language of the old and the new law. This will, and we believe should, await litigation directly involving such questions.

We are of the opinion, however, that we must assume that the Legislature changed the law with a purpose. So assuming, it seems to us that the changes made have substance, and are not merely formal.

We have indicated that we are, in the interest of justice, reversing this case to the Commissioner. Our reversal is for all purposes for the reason that the unsettled state of the law may have caused the parties not to fully and legally develop their case before the Commissioner.

This cause is reversed and remanded to the Savings and Loan Commissioner of Texas for further proceedings consistent with this opinion.

Reversed and remanded.

O'QUINN, J., not sitting.

## ON MOTION FOR REHEARING

HUGHES, Justice.

Appellee accuses us of having taken the quoted testimony of Mr. Lallinger to the effect that there was no need of additional savings and loan associations in downtown Houston "out of context."

In appellee's original brief the only mention it made of Mr. Lallinger's testimony on the issue of public need is the following:

"The relative size of the downtown Houston associations as of January 1, 1964, is shown by the application filed by Gibraltar and by the testimony before the Commissioner of Michael Lallinger, the president of Gibraltar. In 1964, Houston First ranked 5th in asset size

among 260 associations in the state of Texas; Guaranty Federal ranked 11th; Benjamin Franklin ranked 28th; San Jacinto ranked 44th; Home ranked 49th; and Surety after only two and one-half years operation ranked 123rd out of 260 state chartered associations in Texas, according to asset size. Before the Commissioner Lallinger said, 'I do not think there are enough branch offices of existing associations in the downtown area adequately to serve the area and take care of their customers and anybody else that may want to transact business with them.' "

Appellants Houston et al replied to appellee's brief and in it stated:

"In appellee's argument under its Counterpoint Four, and more especially in that portion of it addressed to the issue of 'Public Need,' there are about eighteen references to 'Pro. Ex. 1A,' which is Yeager's affidavit as to his findings and conclusions; and there are no references to any other so-called evidence offered by appellee into the record of the hearing before the Commissioner except a reference to Pro. Ex. 7, a graph showing the growth in savings of certain downtown associations during the period from July 31, 1963, to July 30, 1964, a mention of certain testimony of appellee's president Lallinger concerning the relative size of various Houston associations and a reference to Lallinger's wholly unsupported conclusion that there are not enough branch offices in downtown Houston."

This analysis went unanswered by appellee.

In our opinion we quoted the testimony of Mr. Lallinger which was *unfavorable* to appellee as well as that which was favorable.

If appellee will suggest evidence in the record, not held inadmissible by us, which is relevant to the issue of public need and which will supply a proper context for the quoted testimony of Mr. Lallinger we will gladly incorporate it in our opinion.

The motion is overruled.

Motion overruled.

## ON SECOND MOTION FOR REHEARING

In our first opinion on rehearing we stated that we would include in our opinion such evidence as appellee might suggest relevant to the issue of public need which would furnish proper context for the quoted testimony of Mr. Lallinger. Appellee has referred to testimony of Mr. Lallinger other than that noted in our opinion. Appellee summarizes this testimony under six paragraphs which we quote:

"1. Regardless of the number of savings and loan offices placed in the vicinity of the downtown location of Gibraltar's home office, Gibraltar will have a profitable operation.

2. Lallinger does differentiate between branches and new associations insofar as profitability of operation is concerned.

3. He does not think the same test should be applied to an application for a branch office as is applied to an application for a new office but recognizes that under the rules and regulations the test might be the same.

4. The present facilities are not adequate to serve the needs of savers in downtown Houston. (The Court will note that Lallinger unequivocally expressed this opinion both before and after the testimony quoted by the Court in its opinion.)

5. Lallinger's differentiation between original associations and branch offices is clearly based upon the fact that in his opinion a branch office may be profitable in an area where a new association would be unprofitable. For that reason, as is shown by his testimony on Pl. Ex. 3, pp. 94, 95, 96, he answered that there were

enough associations in the downtown area but that there were not enough branch offices of existing associations in the downtown area to adequately serve the needs of the savings public.

6. The specific testimony quoted by this Court is in answer to a long statement read from a brief in another case and is Lallinger's reaction to that statement."

It will be observed that paragraphs 1, 2 and 5 relate primarily to profitable operation of the proposed branch office as to which issue we found in favor of appellee.

Paragraphs 3 and 6 are patently irrelevant.

Paragraph 4 refers to the following testimony of Mr. Lallinger given on cross examination:

"Q Now, you would agree, would you not, that if the facilities in this, what you call the downtown area there, are adequate to take care of the savers in the area that the public convenience and advantage would not be served by granting an additional branch. Isn't that correct?

A Well, wait a minute. I don't understand your question.

Q You would agree, would you not, that if the present facilities are adequate to serve the needs of savers in the downtown area, that it wouldn't be serving public convenience and advantage to add another office or offices?

A No, I woudn't agree with that.

Q You would not?

A No.

Q In what way would you differ?

A I mean, as far as I am concerned, I think if Gibraltar comes down there—I mean you could say—you could argue that one association

right in the center probably could go and serve all the savers who may be in the downtown area.

Q Add a lot of tellers and serve everybody?

A If you wanted to take that position.

Q That is exactly the position Gibraltar did take, through its attorney, in the Supreme Court, is it not?

A I do not know what the attorney said in the Supreme Court.

Q In your opinion, it is an unsound and inaccurate position? Is that correct?

A Let's say it does not agree with Gibraltar's opinion that one association can adequately take care of the downtown area.

&ast; &ast; &ast; &ast; &ast; &ast;

Q Mr. Lallinger, then, to finally clarify the point, in Gibraltar's application for writ in the Metropolitan case on page 10 this statement is made:

'It is undisputed that the facilities of the presently existing downtown associations are more than adequate to serve those who wish to save. Additional tellers could be employed by the existing associations if the volume of business justified it.'

&ast; &ast; &ast; &ast; &ast; &ast;

Q Well, now, then, to get back to my question which I don't believe you have answered. This is it:

'It is undisputed that the facilities of the presently existing downtown associations are more than adequate to serve those who wish to save.'

Do you agree with that statement?

A No, I don't agree with that statement.

Q And you don't authorize it to be made by Gibraltar?

A I didn't authorize any statement."

Considering this evidence as well as all other evidence properly before us, we remain convinced that we have legally and equitably determined this appeal.

Appellee's second motion for rehearing is overruled.

Motion overruled.