**J. M. FALKNER, Banking Commissioner of Texas, Appellant,**

v.

**GIBRALTAR SAVINGS ASSOCIATION, Appellee.**

No. 10904.

Court of Civil Appeals of Texas.

Austin.

June 21, 1961.

Motion overruled July 26, 1961.

Will Wilson, Atty. Gen., Morgan Nesbitt, Asst. Atty. Gen., Sam O. Kimberlin, Jr., Austin, for appellant.

Monteith, Baring & Monteith, Houston, Graves, Dougherty, Gee & Hearon, Austin, for appellee.

ARCHER, Chief Justice.

This is an appeal from a judgment of the 98th District Court of Travis County decreeing that the order of the Banking Commissioner dated October 11, 1957 denying the Gibraltar Savings Association's application to maintain a branch office of its association at 1262 Uvalde Street in the City of Houston, Texas, not being reasonably supported by substantial evidence, is invalid, illegal, void and of no binding effect and setting the order aside.

All proceedings in this cause were had pursuant to Articles 881a–1, 881a–2, 881a–3, 881a–13, Vernon's Ann.Civ.St., Article 1136a–9, Vernon's Ann.Texas Penal Code, and Rules 167 and 177a, Texas Rules of Civil Procedure.

A suit was instituted by Gibraltar Savings Association, appellee herein, against J. M. Falkner, Banking Commissioner of Texas, appellant herein, as an appeal from an order denying an application to open

and operate a branch office at 1262 Uvalde Street, in Houston, and at a trial upon its merits the judgment appealed from was entered.

The appeal is based on four points, the first being that the Court erred in not sustaining appellant's plea to the jurisdiction because there was no statutory provision providing for an appeal from an order of the Banking Commissioner denying authority to operate a branch office; in setting aside the order of the Banking Commissioner denying the application; in granting appellee's Motion for production of documents, and finally in overruling appellant's Motion to quash a subpoena duces tecum.

The record in this case is extensive and we will not make an effort to refer to all of the testimony but will detail that which we believe supports the Commissioner's order, and that which tends to disprove it and which supports the Court's judgment.

In January, 1957, the association began its arrangements to open a branch office at 1262 Uvalde Road (Northshore, the branch herein involved). On March 11, 1957, the Attorney General issued an opinion holding that the Banking Commissioner had the authority to approve or disapprove branches (prior to that time branches were opened without application to or approval by the Commissioner).

Appellee proceeded to open its Northshore office on March 30, 1957 and notified the Commissioner on April 8, 1957 of such. On April 19, 1957 the Commissioner issued an order directing the association to cease and desist. On May 28 appellee submitted its application for approval of the Northshore branch. Correspondence and meetings were had by the officers of the association and the Commissioner.

An investigation was made by an examiner for the Board and reported to the Commissioner on July 30, 1957.

On October 11, 1957 the Banking Commissioner wrote the following letter to appellee:

"Gibraltar Savings & Building Association
"Houston 1, Texas

"Dear Sirs:

"This will refer to your application to establish branch offices at 8022 Long Point Road and 1262 Uvalde Street in Houston, Harris County, Texas, transmitted to this department by the law firm of Monteith, Baring and Monteith under date of May 28, 1957.

"Pursuant to our investigation with respect to the branch in the Spring Branch area we are declining the approval of same for the reason that in our opinion public convenience and advantage would not be promoted by allowing such proposed building and loan association branch office to engage in business, nor does the population in the neighborhood of such place afford a reasonable promise of adequate support for both the proposed branch office and the other building and loan associations previously established in this neighborhood, and for the further reason that the proposed branch office was opened on March 30, 1957, and has been in continuous operation since that time without notice to or approval by the Banking Commissioner, notwithstanding the fact that the association had received a letter from the Banking Department and a copy of an opinion of the Attorney General dated November 14, 1956, and also a copy of a subsequent opinion rendered by the Attorney General on March 11, 1957, all of which stated that approval of the Banking Department must be obtained before a branch office could be opened for business.

"With respect to the proposed branch to be located at 1262 Uvalde Street, we are declining to approve

this application for the reason that our investigation fails to reflect conclusively that the public convenience and advantage would be promoted by allowing the branch to operate; and further the condition under which the branch was opened with respect to the opinions of the Attorneys General referred to above in connection with the Spring Branch branch is applicable.

"It is our opinion that both branches were opened in violation of the law; that they are operating in violation of the law; and that we are not authorized to permit such operations.

"Yours very truly,

"s/ J. M. Falkner
"Commissioner

The examiner testified as to his connection with the State Banking Department since 1943 and as to his duties as Building and Loan Supervisor in general since 1947. On being questioned he stated:

"Q. State to the Court in general what you did in connection with that investigation. A. I made an on-the-ground investigation. I checked, or observed, and toured the area of the shopping center as well as the residential area surrounding the shopping center.

"Q. Were you by yourself? A. No, I was accompanied by I believe two men from the Gibraltar Savings & Loan Association.

"Q. Do you recall who they were?. A. I stated in my deposition the other day I had forgotten who they were, but I have recalled since that it was Mr. Lallinger and the attorney for the Association.

"Q. That's Mr. Lallinger, the Executive Vice President of Gibraltar? A. Yes, sir.

"Q. You have stated you toured the area. Just explain to the Court briefly what you meant by touring the area. A. I had them drive me up and down the residential streets of the area; people living in that area would or should patronize the shopping center.

"Q. Was that area fully built up at the time you made your inspection? A. No, sir.

"Q. And that was during the latter part of June or the first part of July, 1957? A. Yes, sir.

"Q. Did you get out of the car and inspect the shopping center, the North Shore Shopping Village? A. Yes, sir.

"Q. At that time was that practically completed? A. No, sir, it was partly under construction.

"Q. Were there any stores or shops already in business? A. Yes, sir.

"Q. Approximately how many, if you recall? A. Six or eight stores, I would say, perhaps You could classify them as major, and a number of small shops or offices.

"Q. Did you visit the Gibraltar Savings & Loan Branch Office, which was operated out there? A. Yes, sir.

"Q. Did you talk with the manager? A. Yes, sir.

"Q. Do you recall the name of the manager? A. No, sir, I can't recall his name right now.

"Q. Did you question the manager as to the amount of business the branch was doing in the way of savings accounts? A. Yes, sir.

"Q. Did he make any statement to you? A. He said he had about $75,000 in savings accounts.

"Q. Did he state approximately how many savings accounts there were at that time? A. I think he said 139.

\*   \*   \*   \*   \*   \*

"Q. Now, did you make any further investigation of that area, and if so, state what. A. After making the tour, I talked to the competitive associations to get their attitude toward the feasibility of that branch being in operation· in the center.

"Q. Just state what competitive associations you talked to and who you talked to in connection with each of the associations. A. I talked to Mr. Allen of the Houston First Federal; I talked to Mr. Richards of Benjamin Franklin; and Mr. Chernosky of the Liberty Building & Loan Association, and I talked to Mr. Silvers by telephone of San Jacinto Savings & Loan Association.

"Q. Just state the nature of the investigation you made with each of these. A. I asked them what they thought of the area, if they were serving it, and if they had any objection to the branch being located in that area.

"Q. Did they have any objection to the branch being located in that area, any of them? A. No, they didn't raise an objection.

"Q. What, for instance, did Mr. Allen think of the area? A. He wasn't too much interested for the simple reason he was not making any loans in the area, and he didn't think the area would support sufficient savings to offset the cost of directing any advertising to that area.

"Q. What did Mr. Silvers say? A. He was of the same opinion.

"Q. What did Mr. Richards say? A. He was not interested, he was not interested in the type loans that area would support or offer."

The examiner testified further as to the conversations with competitive associations and as to their views and that they did not have any objections and that he ac- cepted the population figures given in the report and an audit of the income and expenses of the association for the calendar years 1956 and 1957, a six month's period. The witness further testified:

"Q. \* \* \* Now, if nothing more has been built on the North Shore Shopping Center than was in existence at the time of your investigation, and basing your opinion on your experience as a Government loan examiner and the Building and Loan Supervisor for the State Department of Banking, would the neighborhood of the area, or the area where the branch was then located, in your opinion have afforded a reasonable promise of adequate support for a branch?

\*   \*   \*·   \*   \*   \*

"A. At the time I made the investigation, as I stated before, the shopping center was under construction, and there was a question in my mind, if the center was not enlarged, provided for more shops and stores, the center would not attract sufficient customers to create enough patronage for the branch office to make it a profitable operation.

"Q. Now, then, Mr. Benson, you stated you toured the neighborhood, or area, and observed the residences. What in your opinion, based upon your experience as an appraiser of real estate, was the average cost or value, I will use the word 'market value,' of those residences at that particular time, being July 1957? A. My estimation of the value of those properties would vary from ten to twelve thousand dollars.

"Q. Based on your experience, and basing your answer on the value which you have just stated, what would be the average family income of the people living in that neighborhood or area? A. Based on the value of those properties, the average family income would run between about $4,800 a year.

"Q. Give or take either way? A. Yes, sir.

"Q. In your conferences with the various officials of the competitive building and loan associations, did you ask them what their opinion was, if they knew, as to the average family income in that neighborhood? A. Yes, it was between $4,500 and $6,000 a year.

"Q. Then basing your answer on your experience as a building and loan supervisor, in a city the size of Houston, what amount of savings would in your opinion be required to be deposited or created in that branch to enable it to be on a paying basis? A. I made the statement in the report that I didn't think it would break even until the total savings reached $1,000,000, but I based that statement on the current dividend rate, which was three percent. Since that time the dividend rate is now five percent, and in reviewing the reports of the various associations over Texas, they have not been able to increase the interest rate of their mortgages sufficient to supersede the present increase in dividend rates, so I saw that it would require more than that."

Mr. Falkner testified that he did not have any doubts about the reliability and integrity of the management of the association applying for the charter. Mr. Benson testified that the closest association was about 10 miles away.

There was testimony by witnesses called by the appellee herein in the trial in the District Court, some of whom testified as to conditions in general in Houston such as population growth, building and bank and loan deposits during a period of about ten years immediately prior to the application and refusal thereof involved in this cause, and that such growths in Houston were very great.

There were exhibits of maps of areas in Houston and much testimony as to such development.

■ There can now be no doubt but that the Banking Commissioner has the authority and duty to require advance approval of savings and loan associations' branch offices. Southwestern Savings & Loan Association of Houston v. Falkner, Tex., 331 S.W.2d 917.

■ We do not believe that the order of the Banking Commissioner was reasonably supported by the evidence and we believe that the judgment of the Trial Court should be sustained.

■ The Trial Court had jurisdiction to hear and determine, under the substantial evidence rule, the appeal in this cause. Brazosport Savings & Loan Ass'n v. American Savings & Loan Ass'n, Tex., 342 S.W.2d 747.

The Court was in error in granting appellee's Motion for discovery and production of documents, and in failing to overrule appellant's Motion to quash the subpoenas duces tecum issued to the Banking Commissioner and to the Supervisor of the Building and Loan Section and individually. The matters sought to be obtained by appellee are confidential and are privileged and not for public record or inspection under the provisions of Article 1136a–9, Vernon's Ann.Texas Penal Code by the very wording of the statute, reception and use of the record sought by appellee would violate this statute.

The judgment of the Trial Court is affirmed.