**SPRING BRANCH SAVINGS & LOAN ASSOCIATION, Appellant,**

v.

**James O. GERST, Savings & Loan Commissioner of Texas et al., Appellees.**

**No. 11516.**

Court of Civil Appeals of Texas.

Austin.

Oct. 18, 1967.

Rehearing Denied Nov. 8, 1967.

**620**

Jacobsen & Long, Joe R. Long, Austin, Brown, Sparks, Erwin, Maroney & Barber, Frank C. Erwin, Jr., Austin, for appellant.

Crawford C. Martin, Atty. Gen., George M. Cowden, First Asst. Atty. Gen., A. J. Carubbi, Jr., Staff Legal Asst. Atty. Gen., Sam Kelley and Robert C. Flowers, Asst. Attys. Gen., Austin, for appellees.

O'QUINN, Justice.

Appellant is Spring Branch Savings and Loan Association of Harris County, and appellees are the Savings and Loan Commissioner of Texas, defendant in district court, and Houston First Savings Association and Benjamin Franklin Savings and Loan Association, intervenors.

· Two questions are presented by this appeal. First, do the findings of the Savings and Loan Commissioner, denying appellant's application for a branch office in downtown Houston, have support in substantial evidence? Second, is appellant estopped to prosecute this suit because the case is a stale demand and laches precludes assertion of appellant's right?

Appellant, with its principal office at 8224 Long Point Road in Houston, sought to establish a branch office, to be located at 720 Milam Street in downtown Houston. Appellant's application was denied by the Savings and Loan Commissioner in an order entered February 25, 1963. On March 22, 1963, appellant filed its original petition in district court seeking judicial review of the order of the Commissioner and for mandamus to compel granting of the branch office.

The trial court heard this cause October 17 and 18, 1966, and in a final judgment October 21, 1966, sustained a plea of stale demand and laches urged by the Commissioner and intervenors. In the alternative, the court held that the order of the Commissioner of February, 1963, refusing application for the branch office, was reasonably supported by substantial evidence adduced at the trial.

Appellant's original application was filed, the hearing before the Commissioner was held, the order of the Commissioner was entered, and petition for judicial review was filed prior to January 1, 1964, the date Article 852a, Vernon's Ann.Civ.St., became effective. (Savings and Loan Act, Acts 1963, 58th Leg., ch. 113, sec. 1, p. 269). This appeal is governed by provisions of the prior savings and loan law found in Article 881a–1 through 69, Vernon's Ann. Civ.St., and cases decided under these statutes.

Under Article 881a–2, Vernon's Ann.Civ. St., the Commissioner was required to grant a savings and loan charter if, upon finding that the required minimum capital had been paid in cash and that the incorporators were of such fitness and integrity as to justify belief they would conduct an honest and efficient operation, it also appeared to the Commissioner that:

"* * * the public convenience and advantage will be promoted by allowing such proposed building and loan association to be incorporated and engaged in business, and [that] * * * the population in the neighborhood of such place and in the surrounding country affords a reasonable promise of adequate support for the proposed * * * association."

■ The same basic statutory standards governing the creation of savings and loan associations control establishment of their branch offices. Southwestern Savings and Loan Association of Houston v. Falkner, 160 Tex. 417, 331 S.W.2d 917; Falkner v. Gibraltar Savings Association, Tex.Civ. App., Austin, 348 S.W.2d 467 (writ ref., n. r. e.).

In refusing appellant's application for the branch office, following a hearing held December 18, 1962, the Commissioner in his order of February 25, 1963, found that

"The public convenience and advantage will not be promoted by the establishment of the additional office in the neighborhood proposed to be served and in the surrounding country and the volume of business there is not such as to indicate that a profitable operation is probable within a reasonable period of time."

Since this appeal was brought pursuant to provisions of Article 881a–3, Vernon's Ann.Civ.St., and the case law applicable to the savings and loan statutes prior to enactment of Article 852a, the Commissioner's order is subject to judicial review under the substantial evidence rule as applied by the courts of this State to administrative orders including those of the Savings and Loan Commissioner. Gerst v. Cain, Tex. Civ.App., Austin, 379 S.W.2d 699, affirmed 388 S.W.2d 168 (Tex.1965).

For the reason that if the trial court was correct in sustaining the plea of stale demand and laches, the question of substantial evidence need not be decided, we give attention first to deciding whether the doctrine of laches is applicable to this case.

In support of the trial court's action sustaining the plea of stale demand and laches, appellees argue change of conditions and a want of diligence on the part of appellant in prosecuting this suit to set aside the Commissioner's order. Appellees urge that appellant should be relegated to the Commissioner to allow "the Commissioner to consider the application upon the basis of conditions actually existing, instead of upon the basis of purely fictitious conditions." Appellant denies it unreasonably delayed in asserting and prosecuting its claim in court and contends appellees failed to show that delay resulted in a good faith change of position to their detriment.

After the Commissioner denied appellant's application for a branch office February 25, 1963, appellant brought suit for judicial review the following month, on

March 22. The Commissioner answered April 8, and Benjamin Franklin Savings and Loan Association intervened June 28, 1963. The intervention of Houston First Savings Association was not filed until April 25, 1966.

On April 6, 1963, L. D. Cain and others filed application with the Commissioner seeking a charter for Metropolitan Savings and Loan Association to be located in downtown Houston. On June 21, 1963, American Savings and Loan Association applied to the Commissioner for a branch office to serve downtown Houston. The Commissioner denied both applications, the Metropolitan order being in July and the American order in November, 1963. Both Metropolitan and American filed and successfully prosecuted appeals in court.

With the two cases of Metropolitan and American pending, appellant, acting on advice of counsel representing the association, decided to await the outcome of the other two cases before proceeding with its own appeal. The Metropolitan appeal became final March 10, 1965, after decision by the Supreme Court in Gerst v. Cain, 388 S.W.2d 168 (Tex.1965). The American appeal was final in April, 1965, with disposition by the Supreme Court of application for writ of error from decision of this Court in Gerst v. American Savings and Loan Association, Tex.Civ.App., Austin, 384 S.W.2d 352 (writ ref., n. r. e.).

The attorney in active management of appellant's appeal withdrew from the case, within a short time after the Metropolitan and American cases became final, to accept a place in Washington on the staff of the President of the United States. Management of the case was left in the hands of an associate who died in November, 1965, following which the present attorneys were employed by appellant to prosecute this cause.

In January, 1966, appellant, through its attorneys, obtained a trial setting for March 21, 1966. On March 11, the Attorney General as counsel for the Commissioner, advised the trial court in writing that the case had been reset by agreement for May 2, 1966. On April 25 Houston First Savings Association intervened and aligned itself in support of the order of the Commissioner. Shortly thereafter, on April 29, Houston First and the Attorney General filed motion for continuance. The motion was granted and the cause was reset for trial June 6, 1966.

On June 1 the Attorney General filed a first amended original answer and pleaded for the first time stale demand and laches. When the cause came to trial June 6, both intervenors, Houston First and Benjamin Franklin Savings, interposed a second motion for continuance. The motion was granted by the trial court, and subsequently the cause was set down for trial October 17, 1966, when the case was heard.

After the close of evidence, Houston First and Benjamin Franklin Savings filed jointly, on October 21, amended pleas in intervention adopting the Commissioner's plea of stale demand and laches. The trial court entered its judgment the same day, October 21, 1966.

From April, 1963, when the Attorney General answered appellant's suit, until final disposition of the Metropolitan and American cases, two years elapsed during which appellant did not actively pursue its cause. Appellant delayed this period on advice of its attorney who recommended waiting to see what the courts would decide in the Metropolitan and the American cases.

Following this two-year period, and until the case was heard in district court about eighteen months later, the delays occurring appear to have been beyond the control of appellant. After the attorney in charge of the case withdrew in 1965 and upon the death of the attorney who succeeded him in the case, appellant employed the present

attorneys who promptly set about to bring the case to trial. Any delay in prosecution of appellant's case for the next ten months was occasioned by appellees through postponement and continuances. The cause was finally heard in October, after being set for trial four times at the instance of appellant, beginning in January.

Appellees point out that when the Commissioner heard appellant's application for a location in downtown Houston in February, 1963, there were seven savings and loan offices operating in downtown Houston, and that when the case was tried in 1966, there were nine such facilities in downtown Houston. The increase, of course, was occasioned by the addition of Metropolitan and American, whose applications, as already pointed out, were considered and denied by the Commissioner in 1963 shortly after appellant was refused a branch office.

"But the trial court," appellees argue, "was required to test the validity of the Commissioner's order upon the basis of the facts that existed when the order was entered and for that reason could give no consideration to the change in condition caused by the two additional offices."

"On the other hand," appellees assert, "when the Commissioner acted he could not and did not consider the change in conditions caused by the opening of two additional offices because at that time such offices were not in existence. In other words, neither the Commissioner nor the trial court has ever considered whether or not appellant is entitled to the branch office sought by it considering the fact that there are nine savings and loan facilities in the central business district of Houston."

In addition to the change from seven to nine installations, appellees argue that conditions in the savings and loan industry underwent a radical change between February, 1963, when the Commissioner acted, and October, 1966, when this case was tried

in district court. Testimony was introduced to show that 1963 was a period of rapid growth and a time when money was readily available, but that in 1966 the period of growth had come to a halt and "money was tight."

It was because of these changed conditions, appellees argue, that the trial court "abated appellant's suit, thereby relegating appellant to the Commissioner."

We do not agree that these changed conditions pointed out by appellees are properly chargeable to appellant so as to constitute proof of the affirmative plea of stale demand and laches.

Any changes in conditions subsequent to the order entered by the Commissioner in February, 1963, would be irrelevant to the issue of whether the order was reasonably supported by substantial evidence. On the question of whether the doctrine of laches is applicable, the changed conditions shown by appellees relate to economic growth and changes in the city of Houston, and are unrelated to what appellant did or failed to do that could have caused appellees to change their position to their detriment.

Evidence of changed conditions in downtown Houston, between the period in which the Commissioner denied appellant's application in 1963 and the time of trial in 1966, actually shows remarkable growth in the banking and in the savings and loan industries, favorably affecting the two intervenors.

In this period deposits in downtown banks increased by $288,000,000. Between the time of the Commissioner's order and the beginning of 1966 savings in Harris County savings and loan associations increased $327,000,000, from $431,000,000 to $758,000,000. Savings in Harris County banks went up $250,000,000 in a two year period ending in June, 1964.

The workday population in downtown Houston increased by 30,000 persons between early 1963 and October, 1966, when the case was tried, being a gain from 170,000 to 200,000 workers. Off-street parking spaces rose 4,000, from 30,000 to 34,000, in this period. Downtown office space at the beginning of 1963 was 17,700,000 square feet, and at the time of trial these accommodations had grown by 2,200,000 square feet to a total of 19,900,000. More office space was constructed in downtown Houston from 1955 to 1966 than had been constructed in the entire history of Houston prior to 1955.

Changed conditions in the savings and loan industry, appellees assert, support the action of the trial court in sustaining the plea of laches.

William George Richards, chief executive officer of Benjamin Franklin Savings, testified regarding changed conditions in the industry since 1963. It was his testimony that although there had been increased competition for savings from the banking industry, this competition in 1966 had "largely been erased" through governmental regulation. Benjamin Franklin Savings on a capital investment of $1,150,000 made a net profit in 1965 of $523,000, being a return in excess of 45 percent on the investment for that year. Accounts of this association increased from 13,931 late in 1962 to 16,914 by July, 1966, a growth of 2,983 accounts. Savings deposits of the association in the same period increased $19,463,000, a growth from $26,647,000 to $46,140,000. In the same period capital, undivided profits, surplus and loss reserves rose $1,420,294, from $957,573 to $2,377,867.

Houston First Savings, the other intervenor, from early 1963 to the middle of 1966 increased its savings accounts 6,991, a growth from 17,960 to 24,951 accounts. The savings deposits of this association in the same period achieved a gain of $48,908,000, an increase from $81,594,000 to $130,502,000. Growth in the association's capital, undivided profits and surplus and loss reserves in this period was $6,171,000, a climb from $4,853,000 to $11,024,000.

Appellees rely upon Burlington Truck Lines v. United States, 371 U.S. 156, 83 S.Ct. 239, 9 L.Ed.2d 207, in arguing that changed conditions support remand of this cause to the Commissioner for further consideration. In that case the Supreme Court found that the Interstate Commerce Commission in its order did not state any rational connection between the facts it found and the choice of remedies made in disposing of the application and the order was not supported by substantial evidence. The Court noted that Congress about four months after the Commission's order had passed a statute outlawing the type of agreement involved in the case, making the order of the Commission moot in that case. The Court remanded the case to the Commission for proceedings consistent with the opinion.

In the case before this Court there has been no legislation rendering the order of the Commissioner moot. There are no intervening facts, created or brought about by the parties, the courts, or the legislature, requiring or justifying that this case be remanded to the Commissioner for further consideration in the light of changed conditions. The Burlington Truck Lines case is not in point.

The basic rules controlling application of the doctrine of laches by the courts of this State have been settled by the Supreme Court in three cases, the most recent of which was decided in 1964. Culver v. Pickens, 142 Tex. 87, 176 S.W.2d 167 (Tex. Com.App., opinion adopted by Sup.Ct., 1944); Gulf, Colorado and Santa Fe Ry. Co. v. McBride, 159 Tex. 442, 322 S.W.2d 492 (1959); City of Fort Worth v. Johnson, 388 S.W.2d 400 (Tex.1964).

In City of Fort Worth v. Johnson, supra, the Supreme Court held that laches is an affirmative defense, with the burden

on the pleader to prove the essential elements. (388 S.W.2d 400, 403, col. 2). The Court described laches as being akin to the defense of estoppel, and, citing Culver v. Pickens, supra, stated two essential elements of laches:

"Two of the essential elements of laches are (1) unreasonable delay by one having legal or equitable rights in asserting them, and (2) a good faith change of position by another to his detriment because of the delay." (388 S.W.2d 400, 403, col. 2).

■ The burden to prove both these elements was on appellees, they having asserted the doctrine as an affirmative defense. If they failed to prove either element, this defense fails.

■ It is apparent under the rule announced by the Supreme Court that there must be an unreasonable delay by one party that has worked injury to another party. In this case there is want of proof adequate to show inconvenience, prejudice, or injury to either the Commissioner or the intervenors, and the mere lapse of time will not raise a presumption of such detriment.

We can find nothing in the record tending to show that the Commissioner or the intervenors have changed their positions to their detriment by reason of any delay occasioned in this cause. We believe there is no basis upon which any of the appellees could have concluded at any point that appellant had abandoned its effort to procure a branch office in downtown Houston.

On the other hand, appellant was able to show that it was not solely at fault for the delays that did occur. In support of the argument that appellant did not prosecute this appeal with diligence, appellees rely upon several cases in which the courts applied the doctrine of laches or stale demand. In each of these cases, the delay was shown to be the sole fault of the party bringing the suit and in each case the delay itself was the cause of the other party's detriment.

In Flanagan v. Smith, 21 Tex. 493, suit on a promissory note was brought in 1851, and plaintiff waited "nearly five years" before demanding judgment. The principle announced in this case has been summarized as follows:

" * * * where a plaintiff in a case pending on the docket of a court fails to take action therein for four years, in which time the cause of action would be barred by limitation, the defendant should be held to be released from further attention to or defense of the case." Brooks Supply Co. v. Hardee, Tex.Civ. App., Beaumont, 32 S.W.2d 384, 386, col. 2 (writ ref.).

In Reese v. Carey Bros., Tex.Civ.App., Amarillo, 286 S.W. 307 (writ dsmd.), claim to an interest in an oil development was withheld awaiting outcome of the enterprise in which others were spending money and incurring obligations for the benefit of the project. After matters took a decided turn in favor of claimant, the interest was asserted. The court held that the claim should have been asserted at the earliest possible time, especially since it was a mining property of fluctuating character in which the claimant had deliberately avoided risks of the enterprise.

An injunction suit was filed in Stoewer v. Porcelain Enamel, 199 Md. 146, 85 A.2d 911 (1952) in 1939, but plaintiff "allowed the matter to rest until 1950," at which time the whole business of the plant plaintiff complained of had changed. The plant was under different management and its business was not the same, nor was the plant engaged in the practices alleged to be a nuisance.

A contractor, claiming to be the actual low bidder on a construction job, brought suit in New Jersey (Somers Const. Co. v.

Board of Education, D.C., 198 F.Supp. 732), filed for a preliminary injunction which was denied, and before final hearing and opinion on the merits were reached, the contractor voluntarily withdrew his complaint. He waited until another contractor had completed the construction before seeking money damages from the school board. The court held that it would "not allow a contractor who is aware of an improper award to voluntarily and intentionally delay in seeking determination as to the validity of such an award and only after construction is completed seek money damages." (198 F.Supp. 732, 737).

In none of these cases can we find authority controlling the facts of this case. Appellees have not shown that appellant delayed unreasonably in asserting its rights, nor have they made proof of any change of position by the Commissioner or the intervenors to the detriment of any of them because of the delay.

We sustain appellant's assignment that the trial court erred in sustaining appellees' affirmative plea of stale demand and laches.

Whether the Commissioner's order, denying appellant's application for a branch office in downtown Houston, has support in substantial evidence must be decided by this Court under the principles of review prescribed by the Supreme Court of Texas in Gerst v. Cain, 388 S.W.2d 168 (Tex. 1965); Gibraltar Savings and Loan Association v. Falkner, 371 S.W.2d 548 (Tex. 1963); and Phillips v. Brazosport Savings and Loan Association, 366 S.W.2d 929 (Tex. 1963).

This Court will presume that the order of the Commissioner was valid. The discretion of this Court may not be substituted for that of the Commissioner. This Court must sustain the Commissioner if his order is reasonably supported by substantial evidence. The evidence that this Court may consider under the presumption of validity includes proof made at the trial of facts in existence at the time the Commissioner entered his order, whether or not the Commissioner is shown to have been aware of those facts. Phillips v. Brazosport Savings and Loan Association, supra, 366 S. W.2d 929, 936, cols. 1 and 2, 937, col. 1.

As previously stated, the Commissioner in 1963, following his order in February denying appellant's application for a branch office in downtown Houston, also denied American Savings a branch office in downtown Houston in July and refused a charter to Cain and others to establish Metropolitan Savings in downtown Houston in November. The action of the Commissioner later was overturned by the courts with respect to American Savings and Metropolitan Savings. These cases were decided upon facts existing in downtown Houston in July and November, 1963, and the case before this Court must be decided upon facts existing in downtown Houston in February of that year.

The Supreme Court in Gerst v. Cain, supra, observed that "Each substantial evidence case must be decided on its own facts, and the facts in two such cases will rarely be the same." 388 S.W.2d 168, 171, col. 2.

Certain facts, however, with reference to the economic growth of Houston are common to all three cases growing out of the Commissioner's orders in 1963. In the American Savings case, supra, this Court observed that " * * * the evidence indicates phenomenal growth of all associations concerned, whether applicant or protestant, which are located in a city such as *Houston whose growth in the past has been equally phenomenal and whose projected growth portends the same."* (Emphasis added) 384 S.W.2d 352, 357, col. 2. In the Metropolitan Savings case (Gerst v. Cain, 379 S.W.2d 699, Tex.Civ.App., Austin, affirmed in 388 S.W.2d 168), this Court declined to recite or discuss "the mass of evi-

dence produced * * * bearing on the population, growth or economic status of Houston, *except to say that it appears to be phenomenal."* (Emphasis added) 379 S. W. 699, 701–702.

Ralph Ellifrit, formerly director of city planning for the city of Houston, qualified at the trial of this case as an independent planning consultant, and testified concerning the growth and development of Houston, its population trends, its land use, patterns and trends, and economic base. It was his testimony that in 13 years prior to 1963 Houston's population increased by 533,876, and that during the last three years of this period the growth was 107,701 persons, or more than twenty percent of the total growth for the 13-year period.

From prepared exhibits, Ellifrit testified about the freeway system in Houston and the effect of the system upon the growth of downtown Houston. It was shown that the central loop of Houston's freeway system in early 1963 afforded traffic access to and from the central business district on all sides. The freeway system so greatly improved traffic access that in 1963 the central business district had a great growth potential. It was Ellifrit's testimony that downtown Houston in early 1963 had, and in the future will have, the best access by automobile of any city in the United States within the same population bracket with Houston. Ellifrit testified that for this reason the Houston central business district will for many years remain dynamic, in contrast to other cities where the downtown streets are narrow and not connected to a satisfactory system of freeways leading to other areas of the city. All of the streets in the Houston central business district are parts of a one-way street system, with most of the streets feeding into or out of one of the major expressways.

The site proposed for appellant's branch office is at the corner of Rusk and Milam Streets, two blocks west of Main Street, in the central business district of Houston.

Rusk Street affords access to Memorial Freeway on the east, and Milam Street ties into the freeway system to the north and extends south and feeds into the Southwest Freeway. All of the adjacent streets, Travis one block east, Louisiana one block west and Smith two blocks west, tie into the Houston freeway system. Ellifrit testified that left-turn movements may be made easily, since all streets are one-way, with the result that the proposed location for appellant's branch office is near the center of downtown traffic flow emanating from the freeways into downtown Houston.

With reference to growth in office building space in downtown Houston, Ellifrit testified that between 1955 and early 1960 a total of 1,560,000 square feet of office floor space was added to that part of downtown Houston surrounding the proposed location, and by early 1963 an additional 3,200,000 square feet had been constructed. Included in the newest increase was the Tennessee Building with 33 stories containing 950,000 square feet of floor space and the Federal Building with 450,000 square feet. The Federal Building with 1400 employees, is located one and a half blocks from the proposed site, and the Tennessee Building is two blocks south of the location.

From a study of parking spaces available in February, 1963, in the area surrounding the proposed branch office, Ellifrit found that in eight blocks along Rusk Street nearest the proposed site, 1,279 parking spaces were available. As a result of the parking spaces in the area and movement of people from parking sites to the central shopping district on Main and Travis Streets, Ellifrit concluded that appellant's proposed site was located in the central business area with a large foot-traffic passing the location. He also found that foot traffic flowed past the site from the Federal Building.

Future growth of the central business district in Houston, as viewed by Ellifrit

and the city planning department in 1963, is best described by the following testimony:

"Q (by counsel) * * * as of February, 1963, according to the studies which you had made of the City of Houston and the downtown area, had you formed a judgment as to whether or not the downtown area had peaked out in growth as a whole or whether it would continue to develop or did you have any judgment about that at all, as of that time?

    *     *     *     *     *     *

A (Ellifrit) * * * No, we thought and felt that it had every reason to keep on growing because, in the first place, the trends of growth have been continuous almost, except for the normal peaks and valleys that you find in economic conditions, and also as the floor area tends to be flooded a little and then office space becomes scarce; and we felt that the trends and growth of the entire metropolitan area, which would normally be reflected in the Central Business District, that it would continue to grow, and we felt because of the access to the Central Business District and its wide street system and the fact that for some years to come traffic access, ingress and egress, will actually improve, would cause the central area and the Core Area to continue to grow and expand. And this has been borne out since that time."

Further testimony as to growth and economic development of Houston was received at the trial from Dr. Francis S. Yeager, who qualified as an independent economic expert. It was shown that Dr. Yeager, professor of economics and finance at the University of Houston, had engaged in independent consulting work in connection with chartering of banks and savings and loan associations for a number of years, and had conducted ten economic feasibility studies in the past five years.

Dr. Yeager testified that in 1946, after the close of World War II, the city limits of Houston incorporated about 70 square miles, which by 1960 had grown to 350 square miles. Dr. Yeager defined the Houston downtown area as the region between Gray Avenue on the south and Buffalo Bayou on the north, bounded on the east by Crawford Street and on the west by the large freeway interchange. "In other words," Dr. Yeager testified, "that is, in my view, where the action is in downtown Houston."

Dr. Yeager considered the downtown area in 1950 to consist of about 100 square blocks, increasing to 160 or 170 blocks in 1958. The area described by Dr. Yeager as downtown Houston "where the action is" comprises 225 square blocks.

Dr. Yeager placed the workday population of downtown Houston in 1950 at 80,000 to 85,000 persons, which increased to 116,000 by 1958. In 1962 the workday population reached approximately 170,000, an increase of more than 50,000 downtown workers in five years.

Off-street parking spaces in 1950 totaled 11,000 in downtown Houston, increasing to more than double that number in 1958, with 22,300 spaces. In 1962 the number of spaces exceeded 30,000. Between 20,000 and 30,000 cars were parked during all or part of the day in downtown Houston in 1950, and eight years later, in 1958, this number had climbed to 40,000 to 45,000. Dr. Yeager estimated the parked cars in 1962 to be about 70,000. By prepared exhibits, appellant showed all downtown parking in the vicinity of its proposed branch office and demonstrated that about 30 percent of downtown parking would be conveniently situated with respect to appellant's location to serve prospective customers.

Dr. Yeager testified extensively as to other economic indicia relative to the

growth in the Houston economy and its effect on the savings and loan industry.

This portion of Dr. Yeager's testimony is condensed in the following twelve excerpts from appellant's brief:

1

"As of December 31, 1950, the total personal financial savings in Harris County amounted to $1.25 billion; by 1955, they totaled $2.1 billion; and by the end of 1960, they had grown to $3.2 billion. At the end of 1962, total personal financial savings amounted to $3.9 billion, a dramatic increase of $1.8 billion since 1955."

2

"Plaintiff's Exhibit 6 shows the increase in deposits in the downtown Houston banks. In 1955, there was approximately $1.7 billion in deposits, but in December, 1963, those deposits had grown to $2.6 billion, an increase of almost $1 billion."

3

"Plaintiff's Exhibit 7 shows the growth in demand deposits and the growth in savings deposits of all Harris County banks. * * * Demand deposits of individuals, partnerships, and corporations grew from $1.1 billion in 1954 to $1.45 billion in 1963. Savings deposits grew from $150 million in 1954 to $775 million in 1963. This dynamic increase in savings in banks of $600 million in nine years * * *."

4

"Those impressive increases in demand deposits and savings deposits were irrefutable proof of Houston's rapidly growing population, together with rising family incomes and increasing employment in the city. In December, 1958, there were approximately 483,000 people employed in Harris County. By December, 1962, this had increased to approximately 560,000 people."

5

" 'Disposable income' is the income remaining to persons after payment of income taxes. Dr. Yeager estimated disposable income in Harris County at $2.3 billion per year in 1958. By 1962, this had risen to $3 billion per year."

6

"Downtown office space showed explosive growth in the years in question. * * * In December, 1955, there were only 9 million square feet of office space in downtown Houston. At the end of 1960, there were approximately 10½ million square feet. However, only two years later, as of December, 1962, 7.7 million more square feet had been added to the office space in downtown Houston."

7

"Plaintiff's Exhibit 13 shows the new office space built in downtown Houston from 1950 to 1959, from 1960 to 1962, and from 1963 to 1966. The bars on the chart show again that from 1960 to 1962, there were more than 7 million square feet of new office space constructed in downtown Houston, which was more office space than was constructed in downtown Houston from 1930 to 1959."

8

"The fact that the new office space constructed in downtown Houston from 1960 through 1962 was greater than all of the office space constructed in downtown Houston during the previous thirty years is dramatic and convincing evidence of the

explosive growth in downtown Houston immediately prior to the order of refusal issued by the Savings and Loan Commissioner in this case."

9

"The dramatic surge in growth in the Houston economy is reflected in the growth of Harris County savings and loan associations.

"Plaintiff's Exhibit 8 * * * shows the growth in total savings in Harris County savings and loan associations from 1935 through 1965. In 1952, there were $44 million in savings deposits in savings and loan associations in Harris County; in 1955, there were $97 million; in 1958, there were $170 million; in 1960, $263 million. As of December 31, 1962, there were $431 million. Although savings deposits in Harris County savings and loan associations increased spectacularly by $334 million from December, 1955, to December, 1962, there were still only seven savings and loan facilities in downtown Houston in December of 1962, just as there had been seven savings and loan facilities in downtown Houston as of December, 1955."

10

"All of the foregoing evidence indicated to Dr. Yeager that the economy in Houston and Harris County had grown at a much faster rate than had downtown savings and loan facilities. In his opinion, the growth in savings and loan deposits, while spectacular, has in no wise satisfied the public need for additional savings and loan offices when one considers the total personal savings available in the expanding economy of Harris County and the dynamic growth in savings in commercial banks."

11

"In Dr. Yeager's view the principal tool that savings and loan companies have with which to achieve growth is the location of their offices in places that make them convenient to the people they are trying to serve. In view of economic conditions as they existed in Houston and Harris County in February, 1963, Dr. Yeager testified that the public convenience and advantage would have been promoted by allowing appellant's proposed branch office to be placed at the corner of Rusk and Milam. There were no associations located on Milam Street at that time, and there was none at the time of the trial. There were no associations located on Louisiana Street at that time, and none at the time of the trial."

12

"Based upon the foregoing economic data, it was Dr. Yeager's opinion that the population in the neighborhood of the place where this office was to be located and in the surrounding country afforded a reasonable promise of adequate support for the proposed facility at the proposed location in February, 1963. He stated that the statutory phrase 'the neighborhood and surrounding country' includes all of appellant's depositors who have business coming into town on the freeway system. The site was picked in relation to the parking lots and in relation to the feeder streets that feed into and out of the downtown area to make it convenient and easy for appellant's present customers to do business at the downtown office. He stated that the phrase 'neighborhood and surrounding country' also included the thousands of downtown office workers who use the neighborhood during the day while there are no savings offices on Milam Street or Louisiana Street or Smith Street, and none on Rusk Street. The downtown population in 1962 was large and growing. It was large whether it was measured in terms of area or whether it was measured vertically in terms of people in office buildings on Milam, Louisiana, and Travis Streets.

Thus, the proposed savings office would be serving the convenience of the people 'in the neighborhood and the surrounding country.' "

In February 1963, when the Commissioner's order was entered denying appellant's application, five savings and loan associations and two branch offices, a total of seven savings facilities, were operating in downtown Houston. The nearest office to appellant's proposed site was Benjamin Franklin Savings, one of the intervenors, with an office on Travis Street, about one to one and a half blocks from the proposed location. The other intervenor, Houston First Savings, had its office on Fannin Street, about five blocks from appellant's proposed site.

Through James Lammers, executive vice president of appellant association, appellant introduced evidence of growth and vigor of the savings and loan associations in downtown Houston. It was shown that figures were not available with regard to the two branch offices in downtown Houston, but testimony as to the five main savings and loan offices was adduced through exhibits and an officer of one association.

The Lammers' testimony, shown by exhibits, may be summarized in part as follows:

| "Association | Savings Deposits | | Reserves | |
|---|---|---|---|---|
| | Dec. 1957 | Dec. 1962 | Dec. 1957 | Dec. 1962 |
| Benjamin Franklin | $ 6,000,483 | $26,641,277 | $ 300,876 | $ 957,672 |
| Houston First (12–58) | 41,244,000 | 80,829,727 | 2,821,056 | 5,018,563 |
| San Jacinto | 1,609,759 | 16,538,176 | 220,075 | 770,069 |
| Home Savings | 3,799,578 | 13,769,162 | 326,246 | 636,391 |

With respect to all the above listed associations, 'reserves' represent permanent reserve stock of the association, surplus, loss reserves, and undivided profits. The generic term 'reserves' is used to denote the capital structure of the association."

The summary based on the Lammers' testimony included four of the five principal savings offices in downtown Houston. The fifth association, Surety Savings Association, was the newest savings facility in downtown Houston in February, 1963, having commenced business March 28, 1962. J. Keith Lewis, president of Surety Savings, testified that by the end of February of the following year, the association had 1,509 savings accounts, representing total deposits of $4,222,410.14. By the end of 1963, Surety Savings had 2,855 accounts, aggregating $7,193,841.62 in savings deposits. At the close of 1965, savings deposits totaled $14,415,355.03. At the close of business for 1962, the capital, undivided profits, surplus and loss reserves, referred to in general as "reserves," amounted to $449,527.15.

Appellant argues that the testimony of Lammers and Lewis demonstrates that all savings and loan associations having main offices in downtown Houston were in a strong financial condition in February of 1963. Appellant avers that from this evidence the associations were shown to have had dramatic, even spectacular, growth in savings during the five-year period prior to appellant's application and that all five associations had substantially added to their retained reserves.

The two intervenors, Benjamin Franklin Savings and Houston First showed substantial profits for years immediately preceding appellant's application. Benjamin Franklin showed a profit of $130,832.53 in 1961 and $65,189.27 in 1962. Houston First had a net profit of $470,606 in 1962. Richards, president of Benjamin Franklin, testified that in February, 1963, his associa-

tion had just gone through a period of strong and vigorous growth, with $26,000,000 to $27,000,000 in deposits, a profitable operation, and adding, as always, to its reserves, and that as far as he knew the other savings associations operating in downtown Houston were in a strong financial condition.

Lammers, executive vice president of appellant Spring Branch Savings, testified that the association commenced business in June, 1957, with its home office about nine to ten miles west of downtown Houston. The proposed site for its branch office was chosen because of its convenient location in the downtown traffic pattern, with the major traffic arteries from west, southwest, and northwest leading into the downtown area near the proposed location. Lammers stated that much of the population in the area surrounding appellant's home office is composed of junior executives employed in downtown Houston, and that many of the housewives living in the home office area shop in the downtown area. The proposed downtown location would serve the convenience of appellant's present customers who work or shop downtown.

At the beginning of 1963 appellant had $10,300,000 in savings deposits, acquired in four and a half years of operation. Appellant during this period had established one branch office in Houston which had been a profitable operation. It was the opinion of Lammers that the proposed branch office in downtown Houston would offer services of the association to the public as a whole in the downtown area because its location was readily accessible to the principal business area downtown and because the location was easily reached from many parking areas in downtown Houston. Both Lammers and Richards testified that Benjamin Franklin Savings prior to 1963 acquired a site five blocks south of its location on Travis Street as a future new home office, at a cost, Richards stated, of about one million dollars.

It was shown at the trial that Benjamin Franklin Savings maintained office hours from 9 o'clock a. m. until 4 o'clock p. m., Monday through Friday. Appellant operates Monday through Friday from 8:30 o'clock a. m. to 5 o'clock p. m. and on Saturday is open from 8:30 a. m. to 3:30 p. m. Appellant proposes the same hours for its branch office. This difference in hours of operation, appellant contends, shows that public convenience and advantage would be greatly served by appellant's proposed branch office, even if Benjamin Franklin Savings did not move to its new location five blocks south.

Although Benjamin Franklin Savings is the downtown association whose office is located nearest to the proposed location of appellant's branch office, this intervenor declined to inject the issue of harm in this case. Richards testified that " * * * very frankly I don't think we would have lost any substantial amount of deposits because of the very fact that we are more convenient * * *."

Appellant contends that the public convenience and advantage would be served by its branch office " * * * for the further reason that Richards testified that in the last quarter of 1962, Benjamin Franklin reduced its dividend rate from four and a half percent to four percent because, at the time, the association was attracting savings at a faster rate than the association could loan money out in the type of loans they desired to make."

"It was that lowering of dividend rates," appellant asserts, "that caused Benjamin Franklin's savings deposits to decrease by $3,000,000 in the last quarter of 1962."

Lammers testified that in the last quarter of 1962 appellant was paying four and a half percent on savings deposits and continued the rate in the first quarter of 1963. "Clearly that segment of the public," appellant argues, "which withdrew $3,000,000 from Benjamin Franklin would have been well served by the existence of a nearby savings facility paying a rate of four

and a half percent, or one half percent higher than \* \* \* Benjamin Franklin desires to pay its savers."

Testimony in rebuttal to the showing made by appellant was introduced through Richards of Benjamin Franklin Savings. It was his opinion that the most important source of savings in a downtown office was the people who work in the office buildings immediately adjacent to the savings and loan facility. Richards said that he had made no actual survey of the Benjamin Franklin accounts to determine whether this opinion with respect to source was accurate. It was his position that Benjamin Franklin Savings was readily accessible to people in buildings surrounding the savings office, and that this association was closer to some buildings than would be the proposed branch office for appellant. Richards recognized that appellant's proposed branch office would not be inconvenient for persons working in the Tennessee Building, who could walk two blocks to transact business with Spring Branch Savings at the proposed location.

Richards testified that Benjamin Franklin was conveniently located for serving vehicular traffic, as well as pedestrian traffic, and in some instances he considered his association office more conveniently located to vehicular traffic than appellant's proposed site. It was his testimony that the facilities of Benjamin Franklin Savings were adequate for receiving savings accounts and its quarters were ample and attractive. Richards said that his association offered every service and every facility that a savings and loan association could offer to the public and that Benjamin Franklin Savings was fully equipped to take care of the needs of its present customers and future customers as well. It was Richards' view that the savings and loan offices serving downtown Houston in February, 1963, were sufficient to take care of all the business that might come to such institutions. Richards did believe that if shoppers were shopping in downtown Houston, and wanted to transact business with Spring Branch Savings at its proposed branch office, the site would be a convenient location for the shoppers.

Mere sufficiency of existing savings and loan facilities in the neighborhood to take care of the business that usually comes to such offices is not of itself adequate basis for upholding the Commissioner's order denying appellant a branch office in downtown Houston. This Court followed this principle in reviewing an order with respect to chartering an additional bank in Chimney Rock National Bank of Houston v. State Banking Board, 376 S.W.2d 595, (Tex.Civ.App., Austin, no writ). The principle is applicable to the facts of this case with respect to the savings and loan facilities.

The general economy of the city of Houston, and of its downtown area, for the five-year period immediately preceding the Commissioner's order, experienced phenomenal growth, with remarkable advances of population and economic resources. During this period there was no increase whatever in the number of savings and loan facilities in downtown Houston. The existing savings and loan associations in the downtown area, during this same period, prospered and grew as never before.

It was under this state of economy, growth, and potential in downtown Houston that the Commissioner found the public convenience and advantage would not be promoted by establishment of appellant's branch "in the neighborhood proposed to be served and in the surrounding country," and that "the volume of business there" was not such as to "indicate that a profitable operation" was probable within a reasonable period of time.

We hold that these findings by the Commissioner in his order of February 25, 1963, are not reasonably supported by substantial evidence. We have decided that the trial court erred in sustaining the plea of stale demand and laches asserted by appellees and in finding that the Com-

missioner's order was reasonably supported by substantial evidence. We, therefore, reverse and render the judgment of the district court.

Reversed and rendered.

## DISSENTING OPINION

HUGHES, Justice.

The Commissioner in his answer pleaded the long delay, March 1963 to January 1966, by Spring Branch in prosecuting its suit for a judicial review of his order denying the application of Spring Branch for a branch office in downtown Houston as being detrimental to the public interest and welfare and as constituting laches and a stale demand. In its primary ruling, the trial court sustained this pleading. The majority has overturned this ruling, and it is from this action of the court that I respectfully dissent.

The only excuse offered by Spring Branch for the long delay was, on advice of counsel, that it await the outcome of the Metropolitan[1] and Great American[2] cases in each of which cases establishment of a downtown Houston office for a savings and loan association was upheld. It is my opinion that this is an invalid excuse.

The rule to be applied in this case is stated in Vol. 30A C.J.S. Equity § 114 as follows:

"A party is required to exercise diligence and not inaction when seeking to challenge the legality of a proceeding involving a public interest, and failure to do so constitutes laches."

Cited in support of this statement is Somers Constr. Co. v. Board of Education, 198 F.Supp. 732, D.C.N.J.

Savings and loan associations operate in the field of public interest and are considered as quasi-public institutions. Brazosport Savings and Loan Association v. American Savings and Loan Association, 161 Tex. 543, 342 S.W.2d 747.

The interest of the public here is obvious. Just how many savings and loan associations does the public interest require in downtown Houston? This is a matter primarily for the determination of the Commissioner. When the Commissioner entered his order in this case there were seven downtown Houston savings and loan offices. Now there are nine. The Commissioner should, in the first instance, be allowed to exercise his discretion in deciding whether there should be ten savings and loan offices in downtown Houston.

Presumably, under the majority opinion, if there were a dozen denied applications for savings and loan association offices in downtown Houston on appeal to this Court under the same conditions as exist in this case we would have to consider each case separately and without regard to each other and if one application was entitled to be granted then all would have to be granted. This would create an intolerable situation and one which I have no doubt the courts would resolve in a sane manner.

If appellant had prosecuted its appeal with dispatch it would have undoubtedly been successful since the later applications of Metropolitan and Great American were finally granted. Surely, since appellant was first in time and the facts identical it would not have been unjustly treated. Due to its inaction, however, the situation is changed. It is no longer first. It is third.

I believe Spring Branch should, if it desires, renew its application to the Commissioner and establish, if it can, its right to establish a savings and loan association office in downtown Houston under conditions as they exist at the time of such renewal.

I would affirm the judgment of the trial court.

---

1. 388 S.W.2d 168 (Tex.S.Ct.1965).

2. 384 S.W.2d 352, Tex.Civ.App. Austin, writ ref. n.r.e.